UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA

_____
                                              )
In re:                                        )
                                              )
AR UTILITY SPECIALISTS, INC.        CH: 11 ) 2:05-bk-10489-GBN
                                              )
1) CONTINUED HEARING RE: MOTION FOR           )
ACCOUNTING AND FOR APPOINTMENT OF A           )
TRUSTEE FILED BY THOMAS L. KUMMER.            )
(RESET FR. 08-11, 09-14, 11-16, 03-26         )
& 04-19)                                      )
                                              )
2) CONTINUED ACCELERATED HEARING RE:          )
U.S. TRUSTEE'S MOTION TO APPOINT A            )
CHAPTER 11 TRUSTEE.                           )
_____ )


                        U.S. Bankruptcy Court
                        230 North Avenue, Suite 101
                        Phoenix, Arizona 85003-1706

                        May 24, 2007
                        10:03 a.m.

        BEFORE THE HONORABLE GEORGE B. NIELSEN, JR., Judge

APPEARANCES:

For the Debtor:          William R. Richardson
                         Richardson & Richardson, P.C.
                         1745 South Alma School Road, #100
                         Mesa, Arizona 85210-3010


For the United States    Elizabeth C. Amorosi
Trustee:                 Office of the U.S. Trustee
                         230 North 1st Avenue, Suite 204
                         Phoenix, Arizona 85003

For Thomas L. Kummer:     Thomas L. Kummer
                          2164 Siesta Avenue
                          Las Vegas, Nevada 89169

Proceedings recorded by electronic sound technician,
Joann Stawarski; transcript produced by Voice Writers of
America.

1          THE CLERK:  Please rise.

2          THE COURT:  Be seated.

3          THE CLERK:  Case No.05-10489, AR Utility Specialists,

4    and there is not a telephonic appearance.

5          THE COURT:  I'll take appearances.

6          MR. RICHARDSON:  Good morning, Your Honor.

7    William Richardson for the debtor.

8          MS. AMOROSI:  Elizabeth Amorosi for the US Trustee.

9          MR. KUMMER:  Good morning, Your Honor.

10   Thomas L. Kummer, pro se.

11         THE COURT: Good morning, lady and gentlemen.  These

12   are continued hearings on these matters.  Of course, a

13   principal matter is they're all important, but I want to focus

14   on this -- the continued hearing on the trustee motion.

15         Mr. Kummer has supplemented his papers which is fine,

16   but in particular I was interested in the US Trustee's thoughts

17   about an appropriate way to protect creditors, ensure that

18   these -- this matter is successfully going forward and still

19   ensure that the business can be conducted.  See if there's any

20   further developments or thoughts.

21         Ms. Amorosi?

22         MS. AMOROSI:  Your Honor, I received the tolling

23   agreement that Mr. Richardson filed in this case.  I got the

24   hard copy of it 45 minutes ago, although I understand it was

25   filed early this morning.  I don't know looking at it and

1  perhaps Mr. Kummer does know whether all the targets of

2  potential fraudulent conveyance actions are included.

3        I don't know the legal effect of the tolling

4  agreement.  I'm -- I'm not smart enough to look at it in 45

5  minutes and tell you whether it does what it needs to do.  I'm

6  also concerned that it's not really an ordinary course

7  transaction for this debtor and it might be something that the

8  Court needs to approve and it should be noticed out to

9  creditors.  So that hasn't happened.  It's simply been filed

10 with the Court.  So the legal effect of it is a mystery to me.

11       The Bar Date for these claims is two weeks from

12 tomorrow so it is sneaking up on us.  I had an analyst in my

13 office look at the financial spreadsheets that were prepared by

14 Mr. Kummer and -- and attached to his motion I think or at

15 least given to me and it does appear that the debtor has been

16 losing money and increasing debt for a significant period of

17 time, which again is not a good situation.

18       You had expressed concerns at the last hearing raised

19 by Mr. Richardson's argument that the -- the debtor essentially

20 wouldn't -- the debtor is Mr. Reynoso and if Mr. Reynoso wasn't

21 in power, the debtor could not possibly succeed and again

22 not -- not knowing exactly how the business operates it does

23 seem like a significant number of people in Mr. Reynoso's

24 family derive some financial benefit from this debtor and that

25 he certainly would have every incentive to work with the

1  trustee to ensure that this business is successful and it is

2  reorganized.

3        It's conjecture from both sides, I guess, what would

4  happen, but -- and finally the debtor has filed a response to

5  my motion and Mr. Kummer's motion, which I have not finished

6  reading. It literally was coming over the fax as I was walking

7  up here. So I'm not sure what's in there or whether that will

8  change my view. It's a fairly lengthy motion with lots and

9  lots of attachments and I -- I simply don't know what's in

10  there.

11        But as we stand here today, I don't think my opinion

12  has really changed. Yes, I was first concerned that there was

13  no counsel, but raised in my motion was -- was the secondary

14  and -- and now perhaps more important concern that it does

15  appear a significant Bar Date is going to pass.

16        I'm not sure the tolling agreement fixes that. I'm

17  not sure that even if it's an appropriate way to present it to

18  the Court and it's fine for the debtor to enter it with its

19  principals and -- and insiders; whether it -- it would accrue

20  to a later appointed trustee or not or whether it just is the

21  debtor's cause of action; it raises a lot of questions that --

22  that I don't think we can answer standing here today. So

23  that's how I see it.

24        THE COURT: All right. Well, what's -- based on that

25  presentation, what's the US Trustee's position here? Are you

1   seeking an appointment this morning?

2           MS. AMOROSI:  I'm still seeking an appointment of a

3   trustee, Your Honor.  I thought through your special master of

4   suggestion and I researched it a little bit.  I couldn't find a

5   lot of examples of it in Bankruptcy Court.

6           I'm not sure what the powers of the special master

7   would be to bring an action.  It -- it actually seemed like it

8   would be more complicated than -- than a trustee, but I do

9   think there should be an independent third party involved in

10  this case pursuing these actions, ensuring that the assets are

11  properly pursued and accrued for the -- the creditors.  I

12  simply don't have enough information to feel comfortable that

13  the problem is solved.

14          THE COURT:  All right.  So you're no more

15  enthusiastic over my special master than is Mr. Kummer then.

16          MS. AMOROSI:  Thanks, Your Honor.

17          THE COURT:  All right.  Mr. Richardson, there's a

18  response. I haven't seen it and --

19          MR. RICHARDSON:  May I approach, Your Honor?

20          THE COURT:  Well, that's -- that's fine for me to get

21  a copy, but --

22          MR. RICHARDSON:  I understand that, but I'll discuss

23  it.

24          THE COURT:  All right.  Well, I think it would be a

25  better use of our time if you would skillfully incorporate the

1    essence of this response in your remarks.

2              MR. RICHARDSON:  I will do so.  If I may -- may I

3    approach the Court?

4              THE COURT:  All right.  I'll take -- I'll gladly take

5    a bench copy.  Thank you.

6              MR. RICHARDSON:  Well, Your Honor, with that a couple

7    of days notice to me to initially get here a week ago and --

8    and only a week to try to put something together, quite

9    frankly, I -- I was hard-pressed to do so just because the, you

10   know, there -- I think there are almost four --

11             THE COURT:  It's like -- it looks like you were

12   successful by the -- the heft of this thing.

13             MR. RICHARDSON:  400 docket entries approximately in

14   this case and so a lot of them tie back to each other and a lot

15   of different transactions went on.  So it is a difficult thing

16   for me to try to get a handle on.  The heft should not dissuade

17   the Court.  It's actually the -- the written word is probably

18   only five pages double-spaced, literally double-spaced.

19             THE COURT:  A mere pittance.

20             MR. RICHARDSON:  A mere pittance for what lawyers can

21   typically do.  Let me address first a couple other things.  The

22   concern by the US Trustee seems to be that dates are going to

23   run and no one will have a chance to take a look at these

24   claims and verify that the claims are -- should or not --

25   should or should not be pursued.

1        You know, anytime you get a -- a closely held

2 corporation you're gonna have these kinds of issues, but that

3 doesn't mean that in every case you'd have a trustee appointed.

4 The -- the factor that seems to be prompting this is the

5 running of the July 10th date, which is the two-year date for

6 filing claims under Section 108.

7        So we have resolved that issue.  I have Mr. Reynoso

8 here and he can -- he can help me on this issue, but I believe

9 we have all of the related insider creditors that anyone could

10 have any question about.

11        There is Mr. Reynoso, his wife who -- is the divorce

12 final?  They're in the middle of a divorce.  Mr. Reynoso's

13 three children and a sister of Mr. Reynoso.  The tolling

14 agreement specifically provides and -- and quotes Section 108

15 and says that not withstanding the entire time period in -- in

16 Section 108 (a) the toll -- the statute of limitations shall be

17 tolled and shall not run for one year beyond that date.

18        So there's a whole year in which to address these

19 issues.  We can address the merits of these for one thing.  The

20 claims for the Cal Can stock, that's one of the things

21 Mr. Kummer brought up, and that's where the children, the wife,

22 and the sister, and Mr. Reynoso come in.  Those were 2,500

23 bucks a pop and I believe those were delivered in 2003.

24        So if there's any claim whatsoever, there would be

25 a -- a fraudulent conveyance claim under Section 540 or Section

1  544 under the State law.  So we're -- we're talking about a

2  $2,500 claim against each of them for that.  That's one of the

3  claims that he's asserting.

4          The second one has to do with the -- the stock of the

5  name here Golden Anvil.  It's a Mexican outfit.  There's

6  Mexican stock of a Mexican corporation in Mexico.  My

7  understanding is that and -- and, Mr. Reynoso, please correct

8  me if I'm wrong, but that much of that stock was already issued

9  in the name of the debtor; that there were a few shares issued

10 in Mr. Reynoso's name.  Mr. Reynoso -- Mr. Reynoso has

11 acknowledged that that stock belongs to the corporation; it was

12 paid with corporate funds.  Is that correct?

13          MR. REYNOSO:  That's correct.

14          MR. RICHARDSON:  So that's not an issue.

15 Mr.  Reynoso's fully prepared to issue whatever needs to be

16 done, the books of the Mexican corporation.  It really is only

17 a question of what has to do be done to have that stock

18 tendered to the corporation and, you know, I'm not a scholar on

19 Mexican law and I don't know many people who are, but at least

20 from this side of the border Mr. Reynoso's perfectly willing

21 and able to execute an assignment of that stock.

22          With the respect to a claim of a preferential

23 transfer, there were funds that were tendered to Mr. Reynoso

24 prior to the filing of the petition.  He withdrew I think the

25 number was $242,000 of his retirement annuity and -- and put

1  that back into the corporation.  I think if you look at Section

2  547, I think it's (d), you know, you get a netting effect so

3  the amount in -- in question is very small as far as I know.

4          But -- but with the tolling agreement and -- and

5  I've -- how -- can't present you with the case, but every

6  tolling agreement I've ever seen that's been enforced the law,

7  you know, generally looks at scants at toll -- to statutes of

8  limitations anyway and so we have an agreement.  I carefully

9  drafted it.  I believe it is effective.  If they -- if the

10  trustee or anyone else has reason to believe that it's not

11  effective, I'd be happy to modify it in whatever way possible

12  so that that is not an issue.

13          But, again, even with those -- those individuals the

14  particularly with respect to the Can -- Can Cal resources

15  limited stock that's a very small amount.  With respect to

16  Mrs. Reynoso, and I think that's something that Mr. Kummer may

17  bring up, that lawsuit was already filed in the Superior Court

18  against Mrs. Reynoso and we're prepared to do that again and

19  also include her and the other defendants in that case in an

20  adversary proceeding in the -- in this Court.  I will have that

21  filed as soon as the Court orders it, but certainly before

22  July 10th.

23          So any claim that was -- was asserted in that case

24  and -- and incidentally that case was brought by

25  Peter Strojnik, the same attorney brought on behalf of the

1  debtor, and he's the same attorney who was representing

2  Mr. Kummer in this case, but in any event Mr. Strojnik drafted

3  that complaint and Mrs. Reynoso is a defendant along with some

4  other former officers of the company.

5          THE COURT:  Is -- is that an action now that is

6  currently pending?

7          MR. RICHARDSON:  It was dismissed.  Mr. Strojnik

8  withdrew his counsel.  He was appointed as special counsel.  I

9  believe you authorized him to withdraw and I'm prepared to pick

10 that up and re-file it as an adversary proceeding in this case

11 and we will -- we will do so before June 10th.  Again, the

12 complaint's already filed; she knows it's out there.

13         THE COURT:  The -- the complaint was dismissed by the

14 Superior Court for lack of prosecution?

15         MR. RICHARDSON:  I don't know the answer to that.

16         THE COURT:  All right.

17         MR. RICHARDSON:  I've -- I can -- I've only dug so

18 far, but I'm quite sure that that's -- that's the -- the --

19 I -- I believe that that's the case based on what the client

20 has related to me.  The statute of limitations will not have

21 run on that, it's a four-year statute of limitations anyway for

22 claims arising into the Arizona Fraudulent Conveyance Act so

23 there's no danger of that claim even running.

24         I think what we are asking the Court to do is with

25 the tolling agreement that we have, give us a chance to work

1   out a settlement and if somebody thinks we're not disclosing or
2   if somebody feels like they need to come and look at our books
3   or any other record, let them come in.
4          Now, Mr. Kummer operated as the CFO of this company
5   for some time; he's intimately familiar with that.  I just
6   don't want to have this case slow down by a trustee or even by
7   a special master.  We want to settle up with these claims,
8   provide full disclosure to all creditors and interested
9   parties, and if anybody wants to take a deposition, they want
10  to look at the books, and they want to question what we're
11  doing here, we'll be glad to do that, but I don't want
12  June 10th to be the cause of the appointment of a trustee
13  'cause there's no need to.
14         THE COURT:  The -- the tolling agreement it's -- if
15  it's effective, and as you've heard the US Trustee is not
16  prepared to agree today that it's -- it's an effective
17  document, but if it's effective then it -- it buys time here.
18         MR. RICHARDSON:  Correct.
19         THE COURT:  And if I were to do what -- what the
20  debtor wants me to do, which is not appoint a trustee at this
21  point, then we bought time to do what?  For --
22         MR. RICHARDSON:  To reach a settlement.  We will make
23  demands and -- and my understanding is that with respect to the
24  Can -- Can --
25         THE COURT:  To -- to -- to reach a settlement with

1  the -- the moving parties here or reach a settlement with over

2  the -- the possible avoidance actions with insiders?

3      MR. RICHARDSON:  Over the avoidance actions.  My

4  understanding is that -- that all the kids and -- and the wife

5  are all prepared to return the Can Cal stock.  The other claims

6  that were asserted against Cynthia Reynoso were I -- I believe

7  Section 548 claims or -- or since it was filed I think before

8  the bankruptcy case, it would've been filed under the Arizona

9  statute.

10      So those claims can be reasserted and they will be

11  reasserted.  There's no -- we have no compunction on that.

12  She's not involved in the company or anything else.  And I -- I

13  might add that Ms. Amorosi, you know, I -- I feel bad for

14  putting her in this position.  I worked basically all night to

15  try to get this together.  You can see that we filed the

16  tolling agreement I think it was three something this morning.

17  I'm pedaling as fast as I can to get this done.

18      I'm willing to do whatever necessary to make it work,

19  but my understanding is that there's only Mr. Reynoso that

20  works there and his daughter Stephanie works there part-time.

21  There's nobody else there besides Mr. Reynoso and this is -- is

22  an important thing and -- and if you take a look at what we

23  have -- well, I was gonna address the increasing debt issue.

24      When this bankruptcy case was filed that we -- they

25  had a project in Yuma that was already in the toilet, whether

1  it was booked or not it was in the toilet.  There was a -- a

2  plumbing contractor that misplaced the plumbing lines in two

3  government buildings down there and also a HPAC heating,

4  ventilation, and air-conditioning contract who also had similar

5  problems.

6        The client had to go down and cut the floor out,

7  remove the pipes, re-plumb, you know, incur lots of time and

8  lots of expenses in doing that.  So when you look at how the

9  debtor's doing in this case you can't say, well, because you

10  already had a -- a big turkey in the oven, you're losing money.

11        What happened ultimately in this case is the client

12  went down there and fixed the problem, worked with the -- the

13  bonding company, got the job done and minimized the damages.

14  I -- I know in particularly one instance in particular the

15  client saved $40,000 by working a deal to avoid liquidated

16  damages on the project and Mr. Reynoso went down there

17  personally and handled that.  But regardless of what was gonna

18  happen in this case, there was gonna be a big loss from that

19  job.  But that isn't a loss that's attributable to how the

20  company's run post petition.

21        The company's been run fine and -- and the

22  projections and actual numbers right now show a positive

23  return.  We have provided that information in -- in our

24  documentation here.  It is Exhibit 2.  Takes this year with the

25  figures we have to date and projects out to, I think, if I can

1    read my numbers, I think it's $367,000 profit for this year.

2           The last three months, I understand, the debtor has

3    been profitable.  And this, of course, occurred in a situation

4    where they had a flood in October.  They had to abandon the

5    premises.  Your online copy of this -- this document will be

6    better because it has a colored picture of -- of the

7    devastation the -- the debtor suffered.

8           The walls were all cut out up -- up to 24 inches, it

9    had to be rewired, everything had to be torn out and replaced.

10   Contrary to Mr. Kummer's contention, the debtor did lose time.

11   The debtor had to fight to keep its customers and make sure

12   that customers knew that the doors were still open.

13          Didn't miraculously orchestrate an agreement with the

14   landlord to take temporary space across the way, run their

15   computer lines from makeshift pole to pole so that they could

16   keep their operations running.  They did everything possible,

17   but they did have that loss.

18          Any company regardless of whether it's a operating

19   Chapter 11 debtor company or whether it's a -- a company

20   outside of a bankruptcy, would've had those losses.  I mean

21   those are not losses resulting from poorly running the estate.

22   Again, the Court may recall that this bankruptcy was filed

23   because of a TRO in the first place in the context of a divorce

24   tying up all the funds and so forth.

25          So this is not a situation where you had a company

1  that was already limping around.  It was going to face this

2  loss, but it mitigated the loss and it has done well.  The

3  projections reflected on Exhibit 3 reflect that in over four

4  years the debtor will have income of over $3 million.

5          The -- our motion -- in our motion we reflect that we

6  now have contracts or extended contracts or new contracts

7  totaling $6.9 million.  Those were all obtained solely because

8  of Mr. Reynoso.  We've listed in the motion a number of -- of

9  awards that are given -- were given to him because of his

10  business acumen and his involvement in the community.

11          He knows how to run an engineering business; he did

12  it for years, but he ran into some of unforeseeable events.

13  But again, if you were to -- if you are to take out the cost of

14  the loss on the Yuma job and just look at the company even with

15  the flood there's only a net $200,000 loss and that's already

16  been made up for by payments from the insurance company for

17  business interruption, and we're looking at another $267,000

18  coming from the insurance company at a minimum.

19          Those figures are contained on -- on exhibit --

20  Exhibit 4 shows a figure of $275,000 that we already know we're

21  gonna get and a total of about $668,000 from that flood.  So

22  even without all of that, we received part of it, but even

23  without all that, we're in the black; right now we're

24  operating.

25          You go appoint a trustee or you -- you -- you, you

1   know, interfere with the debtor's ability to operate its
2   business and it's, one, gonna run up administrative expenses
3   for an estate that can't really afford it; and two, it's gonna
4   further hamper the debtor.  You know, we -- we -- we -- the
5   debtor had just got in a position where it's got a cash
6   collateral agreement.  The debtor sold property, paid off the
7   Bank One obligation.

8           Bank One, Mr. Collins, was in here regularly on this
9   case and -- and we're having to deal with them, so that one's
10  been taken care of.  Part of the merchant's bonding
11  obligation's been paid off out -- out of those proceeds.  So
12  the debtor's made real progress here and there really isn't a
13  situation where the -- the debtor can be hurt or the estate can
14  be hurt or creditors can be hurt.  There's really only a pause
15  and I think, you know, obviously the standard is is whether
16  it's in the best interest of creditors and -- and or the
17  estate.  I mean, I -- I don't think it's in the best interest
18  of any of them.

19          I will finally note that the individual who is
20  bringing this is an attorney.  Mr. Kummer is apparently
21  licensed in the State of -- of North Carolina and in the State
22  of -- of Nevada.  Within I think it was four days after
23  file -- after resigning his position he sent a proposal to --
24  to purchase the company from my client with a list of names of
25  people who were purportedly willing to go with him.

1     That cause -- caused a massive fallout of its own in
2  the -- in the -- in the case and -- and the -- and the debtor
3  had to overcome that, replace a lot of those individuals, and
4  get new individuals, train them and get going.  It's apparent
5  to me and -- and I guess we'll -- we will have to look at this
6  further in the context of an adversary proceeding, but that
7  Mr. Kummer would like to see this company further weaken and --
8  and with the hopes of perhaps of getting it himself.
9     He's certainly made a stab at that.  He was supposed
10 to come in as an attorney and -- and propose a reorganization
11 vehicle and never did that.  He authored many documents, and I
12 can't tell you how many 'cause I've only seen a few, but I
13 understand there are many documents, and denominated them as
14 attorney-client privilege.
15     So he was acting as an attorney here in Arizona and
16 now he is here before this Court with confidential information.
17 He -- he got all the books and records and the information he
18 got from the -- his -- his position as a CFO and as an attorney
19 for the company.
20     So, you know, we -- we're -- we're dealing with what
21 we consider a turncoat here and as the -- the motion further
22 indicates Mr. Kummer was disbarred for conduct not too
23 dissimilar for this in the State of -- of North Carolina.
24     THE COURT:  At -- at our -- at an earlier hearing you
25 indicated, as you've done again today, that there might be some

1  type of litigation filed against Mr. Kummer.  Did -- did the

2  debtor obtain any kind of a tolling agreement from Mr. Kummer?

3       MR. RICHARDSON:  Have not.  We'll offer it to him.

4  He can have it if he wants, but there -- there is a need to

5  wrap up these cases.  What I need is time to negotiate.  I

6  will -- we'll seek tolling agreements from anybody who wants

7  them, but -- but that I expect from the tenor of the -- the

8  papers that have been filed, the letters that have been sent

9  back and forth is there's a great unlikelihood that that could

10 be negotiated out.  I think the parties are just too -- too

11 distant positions for that to work out and I think, you know,

12 if you -- you litigate and you get in these cases long enough

13 you have a pretty good sense on what will settle and what

14 clearly won't and I would -- I would place Mr. Kummer's case in

15 the -- in the latter case.

16      We know that Mr. Kummer received or I guess it was

17 called CSK Limited, a partnership of which he was a partner,

18 $21,000 the day before the bankruptcy case was filed as did the

19 attorney who is also a partner in that thing with

20 Mr. Strojnik, received $39,000 immediately before.

21      You know, we're gonna go after all that and we're

22 prepared to file the -- an omnibus case against all those.

23 I've got the research done for purposes of joining Mr. Kummer

24 and taking care of that.  Quite frankly I wasn't as fast as I

25 thought I might be in getting that prepared for this morning,

 1  but it will be prepared and it will be filed.

 2          Ms. Amorosi says that she's lacking information on

 3  some of this stuff.  I'm prepared to come back this afternoon,

 4  tomorrow, or the next day, give her whatever it is she wants so

 5  that she's comfortable.  If she wants a legal memorandum from

 6  me on the efficacy of a tolling hearing; happy to give that to

 7  her.

 8          I'm confident that the cases will all say a tolling

 9  agreement is a tolling agreement, you can waive the statute of

10  limitations.  It's regularly waived, the cases, I think, are

11  pretty unanimous on that although I have not done the research

12  in the bankruptcy context.  I can't imagine why that wouldn't

13  be the case in a bankruptcy case as well particularly where the

14  parties agree.

15          Whether that's an agreement out of the ordinary

16  course, I don't think it is.  I think people negotiate all the

17  time in the context of bankruptcies and outside the

18  bankruptcies to try to negotiate settlements, and it makes good

19  sense in the ordinary course of your business to -- to -- to

20  sign tolling agreements that allow the parties a little bit of

21  breathing room.

22          In Mr. Taylor's defense it -- it looked to me like

23  all he was doing was dodging arrows in this case, was not able

24  to take a very offensive position.  We plan to take an

25  offensive position, get these things resolved so we can get the

1    plan filed.  And my goal is to file a plan of reorganization by

2    July 15th.  I still think we can do it.

3         I think most of the claims against these insider

4    family members will be resolved by then.  They're -- they're

5    rather insignificant.  The only one I -- I think will not be

6    resolved is any claims against Cynthia Reynoso for Section 348

7    claims.

8         So we think we resolved the issue vis-à-vis having a

9    special master or a trustee appointed with the tolling

10   agreement.  If Ms. Amorosi wants again more information, I'll

11   provide it to her.  I'll -- I'll -- I'll go this afternoon and

12   provide her a memorandum.  I'll do whatever needs to be done so

13   I just don't think that's an issue.

14        I think we resolved what the major issue is before

15   the Court and I think that incurring further administrative

16   expense in the form of attorneys' fees is going to be

17   detrimental not only to the bottom line, but also to the

18   operation of the debtor, having somebody else in there and --

19   and going through stuff.

20        We've got a new guy there.  He seems -- Dave Riley,

21   he seems to be doing a good job getting me information, what I

22   need and so forth.  And at this point I think the case ought to

23   proceed as cases typically do even when there are insider

24   claims.

25        Those are -- are resolved, they're disclosed, anybody

1   who wants, particularly Mr. Kummer who is a CFO, he can go in

2   there and check what we're doing.  He can figure out what he

3   needs to figure out to -- to satisfy himself that there's not

4   some kind of hanky-panky going on.  He knows exactly where to

5   look, he knows what that books like -- look like and so forth.

6              So we think that for this narrow issue of family

7   insider claims, that there's really no reason to appoint a

8   trustee.  And I would also say with respect to the note,

9   Mr. Reynoso has a note out there that he's gonna have to take

10  care of.  That claim is a claim, but it's not a claim that has

11  to be brought in any particular time.

12             It's a secure statute of limitations on a promissory

13  note and we have other notes out there that we may or may not

14  try to negotiate around and -- and settle, but just because

15  there's a note to an insider doesn't mean that there's a -- a

16  reason to appoint a trustee.

17             There's no claim that that's somehow devious.

18  There's no claim that that's -- that's somehow underhanded or

19  that something's being hidden as a result of that so that

20  for -- so with respect to the note, there's really no reason to

21  appoint a trustee or a special master.

22             We could fine and -- finally, Your Honor, if you're

23  inclined to appoint anybody, we'd like to have a special master

24  as cheap as possible with a very short rope to take a look at

25  this and -- and advise the parties.  My -- I would

1  alternatively suggest that we provide a discloser within a

2  short period of time to anybody who's interested with the

3  tolling agreement in mind so they could -- so -- so we can tell

4  them what we have, here's the documents, and here are the

5  claims.  Anybody else want to take a look at them, come on in.

6          Thank you, Your Honor.

7          THE COURT:  Thank you.  I -- I know what I'm gonna do

8  in -- in this difficult matter, but I'm gonna turn to

9  Mr. Kummer.

10         Mr. Kummer, I've -- unlike the debtor's brief, I've

11 read your supplemental brief so you needn't repeat it, but

12 there might have been a cut or two taken against you so I'll

13 give you five minutes here if you'd like.

14         MR. KUMMER:  Thank you, Your Honor.  I would like to

15 respond.  It appears that most of the response by learned

16 counsel has been a shoot-the-messenger type of approach and

17 obviously, some point we're gonna get to litigate the validity

18 of these claims that they claim against me doesn't matter.  My

19 interest is for the estate.  I raise a couple of questions for

20 the Court to consider.

21         The first is, I believe that these tolling agreements

22 are questionable in terms of their legal effect.  I would cite

23 the Court to the only case that I could find this morning in a

24 hour that I received since the filings to the case of in re

25 William Pugh verses John Brook out of the Eleventh Circuit, 158

1  F.3d 530 1998 case, in which a very similar tolling agreement
2  came before the Court and the question was whether or not
3  546 (a) is jurisdictional for the Court.
4        Now, the Eleventh Circuit happened to come down on
5  the side that it was not jurisdictional and a tolling agreement
6  perhaps didn't work, but there's no rule in the Ninth Circuit
7  that gives any confidence at all to me, Your Honor, that that
8  is the law in this circuit.
9        I -- I simply want to point out to the Court that the
10 construction projects that have been pointed to were finished
11 in June of 2006, and I would simply point out to the Court that
12 the operations of this company since July have been disastrous
13 in terms of losses.
14       Yes, they had a flood.  How much of a loss is
15 attributed to that?  I -- I don't know, but there's tremendous
16 amount of loss here, Your Honor, and continuing so and I've
17 just raised to the Court the point that even if they had the
18 contracts which are indicated, which I do not believe are in
19 the bag and -- and in hand, this estate does not have enough
20 working capital to go forward and perform the contracts.
21       I do not understand why -- one other point,
22 Your Honor, I'm sorry; digression.  There are a number of other
23 claims in the petition schedules that are not covered by these
24 tolling agreements including one against Golden Anvil Inc.,
25 itself and others they're in the petition schedules, there --

1    they would just go away as of June 11th.

2           I don't know why it is of such concern to these

3    gentlemen to have an independent trustee who can come in,

4    preserve the estate, and look at this situation.  There are red

5    flags everywhere, Your Honor.  The US Trustee has reviewed the

6    numbers and is bringing to you their concerns.  The fact that

7    Lewis and Roca resigned is of -- is of considerable concern I

8    think, because they had two years on this case and they know

9    this case.

10          All of the information that I presented is on the

11   public record.  I have not had access to the books and records

12   since I resigned simply because I knew there were some things

13   wrong in this estate in June -- in January of 2006.  I would

14   like to correct the record, Your Honor, in one particular

15   respect and that is that this gentleman indicates that I have

16   been disbarred.  I have never been disbarred nor have I ever

17   been indicted or convicted for any crime.

18          So I simply think that what we leave the response is

19   here if you cut all through is, come as bad guy and we should

20   continue right on the way we are.  We're proposing these

21   tolling agreements, the legal effect of which is unknown and I

22   would suggest to this Court this very simple fact; this estate

23   will suffer a mortal wound on June the 11th unless this Court

24   appoints a trustee.  And I thank you, Your Honor.

25          THE COURT:  Okay.  A brief final?  Yes.

1        MR. RICHARDSON:  A very brief.  Mr. Kummer's correct.

2    I think the paperwork that we provided reflected he was

3    suspended for three years.  I think he remains suspended for

4    almost five.  We provided the documentation from the Middle

5    District of Georgia on the criminal deal and we did note in our

6    brief that he ultimately had it dismissed, but he entered into

7    a plea agreement on some sort of a trustee related thing.

8        With respect to the losses, you know, the -- there's

9    gonna be a lag between being able to undertake new projects and

10   getting rid of the bad one and I think that that -- that --

11   that any lag time is easily explainable.  So we've provided the

12   documentation.  We've provided the information indicating that

13   this is a viable debtor.  $6.9 million in contracts for a

14   company like this is a huge amount.

15       You don't get contracts with SRP, with Southwest Gas,

16   with APS, or with the CAP if they don't have confidence in you

17   as the individual to deal with it.  He's got the relationships.

18   We don't want to destroy that.

19       Again, we -- we would request that the Court at a

20   minimum give us a day or so to get Ms. Amorosi whatever she

21   thinks, even Mr. Kummer indicates that that the only case he

22   could find supports our view that there's a -- that a tolling

23   agreement works.  I'm prepared to do whatever it is that needs

24   to be done to do that, but we would like the opportunity and we

25   will do it in whatever time the Court tells us to present those

1  claims against the insider creditors that exist and open our

2  books to anybody who wants to do it.  Mr. Kummer can do it on

3  his nickel, but we don't want to have to pay somebody out of

4  this estate to do it.  There isn't enough money and -- and to

5  keep operating.

6      So we want to keep -- we want to generate funds, to

7  not pay lawyers, and not to pay trustees, and not pay

8  examiners, and not pay special masters.  We want to generate

9  funds to pay off the creditors and get a plan out there and get

10  it confirmed.

11      THE COURT:  All right.  Well, I need to dispose of

12  these two motions and I'll do so by a -- a ruling this morning.

13  Not for the first time in Bankruptcy Court a judge is required

14  to make a serious decision after a very short period of time

15  for parties to present their concerns and their defenses and

16  for the Court to understand precisely what is going on.

17      This is what we all know; we know this is a

18  Chapter 11 bankruptcy case that has been operating since 2005.

19  We know that this debtor in possession recently lost its legal

20  counsel and upon departure for, quote, professional reasons,

21  unquote, which account the departing counsel didn't free --

22  didn't feel free to share with the Court or the parties here,

23  but did depart with the information that the statute of

24  limitations is quickly approaching on avoidance actions and

25  there are possible avoidance actions involving insiders of this

```
 1   closely managed family corporation.  So very, very upsetting
 2   allegations to receive relatively late in a Chapter 11 case
 3   with an onrushing statute of limitations.
 4         The debtor in possession I'm pleased to -- to note
 5   retained equally good bankruptcy counsel to represent it and
 6   we've been proffered a tolling agreement.  As the US Trustee
 7   and as creditor Kummer points out, we don't know the legal
 8   effect of these tolling agreements and we don't know that the
 9   tolling agreements cover all possible targets; in fact, we know
10   they do not because Mr. Kummer himself is at least mentioned as
11   a possible target in connection with these matters.
12         It's unfortunate that these avoidance actions
13   couldn't be dealt with some time during the prior two years and
14   instead we have to face a deadline like this.  And I'm told
15   that it's indeed possible if not probable that settlements can
16   be negotiated here.
17         That's a fine thing, but asking a -- a family member
18   to negotiate settlements with his family is as difficult as
19   asking that family member to conduct litigation against them.
20   There is still not the -- the -- the presence of a -- an
21   independent third party.
22         Does a trustee always have to be appointed in a
23   closed corporation, family corporation circumstance?  No.  But
24   events have outrun us and these problems were not dealt with
25   during the prior two years, and now something has to be done.
```

1          What I'm going to do is this, I'm going to grant the

2     motions and appoint and direct the United States Trustee to

3     appoint a case trustee, a Chapter 11 trustee, for this case.

4     I'm asking the US Trustee to not only work expeditiously coming

5     up with a usual fine candidate, but I'm also asking the US

6     Trustee to consult, to consult with parties in interest which

7     would certainly include a responsible law officer, Mr. Reynoso,

8     as to who would be an appropriate person to work with.

9          I'm not committing myself to having a trustee operate

10    during the entire length that this case remains in a

11    Chapter 11.  I don't know that that is at all required, but I'm

12    quite confident that for the foreseeable future, until the --

13    the urgency of possible litigation involving insiders can be

14    resolved in an open and transparent manner, we are going to

15    need a trustee in this case.  So that's why I'm directing the

16    US Trustee to do the necessary appointment.

17          So that's my resolution of these matters.  I'll sign

18    an order when the US, reflecting this, when the US Trustee

19    lodges it with the courtesy copies to the other parties.  And

20    that concludes this hearing for now.

21          MR. RICHARDSON:  Could I pose a question, Your Honor?

22          THE COURT:  Yes.

23          MR. RICHARDSON:  Your -- now, I take -- do I

24    understand that you're appointing a trustee for a limited

25    purpose or to take all the --

1      THE COURT:  I'm -- I'm appointing a general trustee

2  at -- at this point because we don't -- we don't have agreement

3  between the debtor in possession and its principal critic at

4  this point what the economic circumstances are.  But my

5  decision to appoint a trustee is -- is greatly premised on this

6  statute of limitations problem.

7      When that's resolved and when there has been an

8  opportunity for an exchange of information which the debtor has

9  already offered to these parties, it may be that there could --

10  we could agree that the environment won't require the continued

11  appointment of a -- of a trustee.  I'm raising that explicit

12  purpose, but the trustee appointment is a general appointment

13  at this stage.

14      MR. RICHARDSON:  Question, Your Honor, if we were to

15  immediately notice out and set for emergency hearing a -- a

16  settlement agreement that the Court could approve with the

17  insider creditors; would that be sufficient?  I mean it seems

18  to me that the reason we're getting this is because there's

19  some concern on we aren't part of the trustee and somebody else

20  that that may not be effective and if you have two parties

21  with -- and the Court has jurisdiction over that and approves

22  that agreement and says this is the law these are the parties,

23  that takes away the problem.

24      THE COURT:  Well, the -- the -- I -- I think the -- a

25  proposed settlement and -- and I heard earlier that it was the

1  hope to reach a settlement, but this is as I've remarked this

2  is a late hour now and a -- an -- an insider settling with an

3  insider creates the same problems as an insider litigating with

4  an insider.

5        So I don't recommend that resources be spent by the

6  debtor at this point in -- in seeking settlements, but if

7  the -- the debtor has proposals for settlement, if the debtor

8  can -- can serve as to assist the trustee in working out

9  consensual agreements with insiders to resolve these matters, I

10  think that would be a fine thing and that would certainly

11  preserve the State assets, but for now we'll have the general

12  appointment.

13        MR. RICHARDSON:  The question that that raises for me

14  if I need to turn all of my files over to a trustee and

15  basically get out of the case 'cause he's gonna have to do what

16  I've just had to do, incur the same fees for the non-insider

17  creditors.  Is that what you intend?

18        THE COURT:  Why don't you -- why don't -- why don't

19  you retain your files and retain your position as long as

20  you're willing to work for the debtor in -- in this case and --

21  and we'll see what trustee's appointed by the US Trustee and

22  we'll see what that individual wants to do about counsel.  If

23  that individual for that matter even wants to appoint special

24  counsel for certain matters as well.

25        That's -- I think we've had a lot -- enough of quick

1   decisions in this matter, let's -- let's spend some little time
2   considering the next thing that happens in this case.
3           MR. RICHARDSON:  I appreciate that, Your Honor, I'm
4   just at a loss.  I've never been in a case where a trustee's
5   been appointed and quite frankly I don't know what I can do at
6   this point.  I can't do anything without a trustee's approval
7   as far as I can tell.
8           THE COURT:  Well, that's -- it's a learning
9   experience for us and there will only be benefit in that
10  situation.
11          MR. RICHARDSON:  Well --
12          THE COURT:  That completes the hearing for now.
13  We'll be adjourned in this matter.  We're gonna stay in session
14  and call our 10:30 matter in a moment.
15          MR. KUMMER:  Thank you very much, Your Honor.
16          THE COURT:  The parties -- if they would wish to
17  continue their discussions, I hope so, they can continue them
18  outside the courtroom.
19              (The hearing concluded at 10:49 a.m.)
20
21
22
23
24
25

I, Mindee Brown, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


_____     _____
Signature of Approved Transcriber        Date