Thomas L. Kummer
2164 Siesta Avenue
Las Vegas, Nevada 89169
775-338-3705
reno4829@aol.com
Proposing Creditor

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

## AT PHOENIX

| | | |
|---|---|---|
| In the Matter of: | ) | Case No. 2:05-bk-10489 GBN |
| | ) | |
| AR Utilities Specialists, Inc., an | ) | Chapter 11 |
| Arizona Corporation | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |

## DISCLOSURE STATEMENT WITH RESPECT TO PLAN FOR REORGANIZATION UNDER CHAPTER 11, TITLE 11, UNITED STATES CODE OF AR UTILITIES SPECIALISTS, INC, DEBTOR

AR Utilities Specialists, Inc. (the "Debtor") filed its Petition In Bankruptcy pursuant to 11 U.S.C. Chapter 11 on June 10, 2005 (the "Petition Date").[1] Thereafter, the Debtor operated as a Debtor-In-Possession with Alejandro Reynoso as Chief Executive Officer[2]. By order of the Bankruptcy Court dated May 24, 2007, Mr. Dale Ulrich was appointed as Trustee in accordance with the provisions of Section 1104(b) of the Bankruptcy Code (the "Trustee"). Mr. Ulrich has operated the Debtor-In-Possession since his appointment, although Mr. Alejandro Reynoso has maintained day to day control of operations of the Debtor.[3]

---

[1] 11 U.S.C. is hereafter referenced as the Bankruptcy Code.
[2] There was a brief period immediately following the Petition Date when Raymond Cabreja served as President of the Debtor-In-Possession but at all times Alejandro Reynoso has maintained control if the Debtor-In-Possession as the sole director of the Debtor.
[3] Mr. Ulrich has indicated in communications with the Proposing Debtor that he believes the Debtor can operate on a break even point for the foreseeable future. The Trustee has not to date filed a statement of any investigation of the acts, conduct, assets, liabilities, and financial condition of the Debtor, the operation of the Debtor's business, and the desirability of the continuance of such business, and other matters relevant to the case or the formulation of a plan as contemplated in Section 1106(a)(3) and (4) of the Bankruptcy Act. No plan of reorganization has been proposed by the Trustee as contemplated in Section 1106(a)(5) of the Bankruptcy Act.

1

The Debtor has filed reports of its operations with the United States Trustee (the "Reports") since the Petition Date. The last such report was filed for July, 2007. The Debtor has incurred substantial Post-petition debts which have not and cannot be paid from the reasonably foreseeable results of the Debtor's operations. Continuing operations of the Debtor's business by the Trustee is not in the best interests of the Creditors. Therefore, Thomas L. Kummer, an administrative claimant[4] (the "Proposing Creditor") herewith has filed a Creditor's Plan Of Reorganization as provided for in Section 1121(c) of the Bankruptcy Code.[5] The Proposing Creditor provides the following Disclosure Statement in the above-captioned Chapter 11 case with respect to the Creditor's Plan Of Reorganization.

1.    **INTRODUCTION**

The Proposing Creditor is providing this Disclosure Statement (the "Disclosure Statement") to all of the Debtor's known Creditors and Interest Holders in connection with the Creditor's Plan of Reorganization (the "Plan"), a copy of which accompanies this Disclosure Statement. The Plan has been developed based upon thorough review and analysis of the Debtor's financial condition as set forth in the Reports, information from the Debtor relating to its operations, and information obtained from the Trustee. The Plan provides for sale of all assets of the Debtor, including the Debtor's operating business, and payment of Creditors' claims in part. The Proposing Creditor has concluded that the Plan provides fair and equitable treatment of all classes of Creditors and Interest Holders and provides the greatest feasible recovery to Creditors and Interest Holders. Accordingly, the Debtor requests that all Creditors and Interest Holders in Impaired Classes vote to accept the Plan.

2.    **PURPOSE OF DISCLOSURE STATEMENT AND PROCEDURE FOR PLAN CONFIRMATION.**

a.    <u>Purpose and General Information.</u>  Pursuant to Section 1125 of the Bankruptcy Code the Proposing Creditor submits this Disclosure Statement to provide Creditors and Interest Holders with adequate information to allow them to make an informed judgment about the acceptability of the Plan. Specifically, the purpose of this Disclosure Statement is to give Creditors and Interest Holders sufficient information, as far as it is reasonably practicable for the Proposing Creditor to provide, that would allow a hypothetical reasonable investor typical of

---

[4]   Kummer has an approved administrative claim which was approved by order of the Court in accordance with Section 503 of the Bankruptcy Code.
[5]   Bankruptcy Code Section 1121(c) provides that any party in interest, including a creditor, may file a plan if a trustee has been appointed, the Debtor has not filed a plan before 120 days after the date of the order for relief, or the Debtor has not filed a plan that has been accepted before 180 days after the date of the order for relief. In this case, the exclusivity period for the Debtor to file a plan of reorganization has long since passed and neither the Debtor-In-Possession nor the Trustee have proposed a plan of reorganization.

2

the holders of Claims and Interests in the classes Impaired under the Plan to make an informed judgment about whether to accept or reject the Plan. A copy of the Plan accompanies this Disclosure Statement. Terms defined in the Plan shall have the same meaning in this Disclosure Statement. The first letter of words defined in the Plan is capitalized in this Disclosure Statement. Please refer to the Plan for the treatment of Claims and Interests. The provisions of the Plan, if approved, will be binding on all Creditors and Interest Holders, therefore, please read the Plan carefully.

NO REPRESENTATIONS ABOUT THE DEBTOR, PARTICULARLY ABOUT THE DEBTOR'S FUTURE BUSINESS OPERATIONS OR THE VALUE OF ITS PROPERTY, ARE AUTHORIZED BY THE DEBTOR, AND THE PROPOSING CREDITOR MAKES NO REPRESENTATIONS WITH RESPECT TO THE DEBTOR OR IS CURRENT OR FUTURE BUSINESS, OTHER THAN AS SET FORTH IN THIS DISCOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY ANY CREDITOR OR INTEREST HOLDER. ANY ADDITIONAL REPRESENTATION OR INDUCEMENT SHOULD BE REPORTED TO THE PROPOSING CREDITOR OR TO THE UNITED STATES TRUSEE WHO, IN TURN, SHALL DELIVER THE INFORMATION TO THE BANKRUPTCY COURT OR TAKE OTHER APPROPRIATE ACTION.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. THE PROPOSING CREDITOR DOES NOT HAVE ACCESS TO THE BOOKS AND RECORDS OF THE DEBTOR AND HAS THEREFORE RELIED PRINCIPALLY UPON THE REPRESENTATIONS MADE BY THE DEBTOR IN THE REPORTS. FOR THE FOREGOING REASON, AS WELL AS BECAUSE OF THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES AND PROJECTIONS INTO THE FUTURE WITH ABSOLUTE ACCURACY, THE PROPOSING CREDITOR IS UNABLE TO WARRANT OR RERESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS COMPLETE AND ACCURATE, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO PRESENT COMPLETE AND ACCURATE INFORMATION. THE RECORDS KEPT BY THE DEBTOR AND THE REPORTS RELY FOR THEIR ACCURACY ON INTERNAL BOOKEEPING. THE RECORDS KEPT BY THE DEBTOR ARE NOT WARRANTED OR REPRESENTED TO BE FREE OF ANY INACCURACY AND IN FACT ARE NOT BELIEVED BY THE PROPOSING CREDITOR TO BE COMPLETELY ACCURATE. HOWEVER, EVERY REASONABLE EFFORT HAS BEEN MADE TO PRESENT ACCURATE INFORMATION. THE PROPOSING CREDITOR HAS NOT INDEPENDETLY VERIFIED ANY OF THE INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT AND DOES NOT MAKE ANY REPRESENTATIONS OR

3

WARRANTIES WITH REPPECT TO THE TRUTH OR ACCURACY OF ANY OF THE INFORMATION PRESENTED.

ALL PARTIES ENTITLED TO VOTE ON THE PLAN ARE URGED TO REVIEW IN FULL THE PLAN AND THIS DISCLOSURE STATEMENT TOGETHER WITH ALL EXHIBITS ATTACHED THERETO AS WELL AS THE RECORD OF PROCEEDING BEFORE THE COURT INCLUDING THE VARIOUS ADVERSARY COMPLAINTS, PRIOR TO VOTING ON THE PLAN, AND MAY DESIRE TO CONSULT LEGAL COUNSEL PRIOR TO VOTING TO ENSURE COMPLETE UNDERSTANDING OF THEIR TREATMENT UNDERTHE PLAN. THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF CREDITORS AND INTEREST HOLDES OF THE DEBTOR TO ENABLE THEM TO MAKE AN INFORMED DECISION ABOUT THE PLAN.

EACH CREDITOR AND INTEREST HOLDER IS URGED TO CONSLUT ITS OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN TO IT UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND FOREIGN TAX LAWS. THE PROPOSING CREDITOR MAKES NO WARRANTIES OR REPRESENTATIONS REGARDING THE TAX IMPACT OF THE PLAN ON ANY CREDITOR OR INTEREST HOLDER.

RISKS AND OPPORTUNITIES ARE IDENTIFIED IN THE DISCLOSURE STATEMENT CONCERNING THE PROPOSING CREDITOR'S ABILITY TO PERFORM UNDER THE PLAN. THE RISKS AND OPPORTUNITIES ARE DISCUSSED IN ARTICLE *(b) OF THIS DISCLOSURE STATEMENT.

THE PROPOSING CREDITOR BELIEVES THAT THE PLAN IS FEASIBLE, FAIR AND EQUITABLE AND THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND INTEREST HOLDERS.

b.     Manner of Voting.

i.     Classes Entitled To Vote. The Plan divides the Claims of Creditors and Interest Holders into several classes. Only classes of Creditors and Interest Holders with claims or interests impaired under a plan of reorganization are entitled to vote on acceptance of a plan. Generally, and subject to the specific provisions of the Bankruptcy Code, this includes Creditors and Interest Holders whose claims or interests, under a plan, will be modified in terms of principal, interest, length of time for payment, or a combination of the above. Each holder of a Claim in a Class that is not Impaired under the Plan is conclusively presumed to have accepted the Plan, and solicitation of acceptances from the holders of such Claims is not required and will not be undertaken.

Classes, including secured Creditors and unsecured Creditors, are Impaired under the Plan and the members of each of the Impaired Classes are

4

entitled to vote to accept or reject the Plan. The Proposing Creditor believes that no impairment occurs under the Plan with respect to the Pre-petition Creditors or Shareholders, and their vote will not be solicited unless otherwise ordered by the Court.

  ii. Procedure For Voting. All Creditors and Interest Holders entitled to vote may cast their vote by completing, dating, and signing the Ballot included with this Disclosure Statement and mailing it to:

     Thomas L. Kummer
     2164 Siesta Avenue
     Las Vegas, Nevada 89169

**IN ORDER TO BE COUNTED, THE COMPLETED BALLOT MUST BE RECEIVED NO LATER THAN OCTOBER 1, 2007 UNLESS ANOTHER DATE IS ESTABLISHED BY THE COURT. A BALLOT DOES NOT CONSTITUTE A VALID PROOF OF CLAIM IN THE DEBTOR'S CASE.**

c. Confirmation of the Plan.

  i. Solicitation of Acceptance of the Plan. This Disclosure Statement has been approved by the Bankruptcy Court in accordance with Section 1125 of the Bankruptcy Code and has been provided to all Post-petition Creditors and Interest Holders in this Case. This Disclosure Statement is intended to assist Creditors and Interest Holders with their evaluation of the Plan and their decision to accept or reject the Plan. Acceptance of the Plan may not be solicited unless the solicited Creditor or Interest Holder receives a copy of this Disclosure Statement at the time of, or before, such solicitation.

  ii. Votes Considered in Determining Acceptance of the Plan. When acceptance of the Plan is determined by the Bankruptcy Court, in accordance with Bankruptcy Code Section 1126 and Rule 3018 of the Federal Rules of Bankruptcy Procedure, votes of Creditors will only be counted if submitted by Creditors with Allowed Claims who are members of Classes, including Administrative, Secured, Preferred Unsecured and Unsecured General Creditors. If you are in any way uncertain if or how your Claim has been scheduled, you should review the Debtor's schedules and any amendments thereto which are on file with the Clerk's Office of the United States Bankruptcy Court, District of Arizona, Phoenix Division. Pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure, votes of any Class of Interest Holders will be counted only if submitted by the holder of record on the date the order of the Court approving the Disclosure Statement is entered.

  iii. Hearing on Confirmation of the Plan. The Bankruptcy Court has set a hearing to determine if the Plan has been accepted by the required number of holders of Claims and Interests and if other requirements for

Confirmation of the Plan outlined in the Bankruptcy Code have been satisfied. The hearing on Confirmation of the Plan shall commence on * in the United States Bankruptcy Court. Any objections to confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Curt and served on the Proposing Creditor on or before the date set by the Court.

iv. Determining Whether Impaired Classes Have Accepted the Plan. At the scheduled hearing on Confirmation of the Plan, the Bankruptcy Court must determine, among other things, if the Plan has been accepted by each Impaired Class. Under Section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims is deemed to have accepted the Plan if Class members holding at least two-thirds (2/3) in amount and more than one-half (1/2) in number of all Allowed Claims of Class members actually voting have voted in favor of the Plan. Under Section 1126(d) of the Bankruptcy Code, an Impaired Class of Interests is deemed to have accepted the Plan if Class members holding at least two-thirds (2/3) in amount of the Allowed Interests of Class members actually voting have voted in favor of the Plan. Further, under section 1129 of the Bankruptcy Code (11 U.S.C. Section 1129(a)(7)(A)(ii)), if each holder of a claim or interest in a class has not accepted the Plan, the Bankruptcy Court must also find that each member of an impaired Class will receive or retain as much under the Plan as the member would receive or retain if the Debtor were liquidated, as of the Effective Date of the Plan, under Chapter 7 of the Bankruptcy Code.

v. Confirmation of the Plan Without Consent of all Impaired Classes. The Plan may be confirmed even if not accepted by all Impaired Classes, if the Bankruptcy Court finds that all other requirements for Confirmation under Section 1129(a) of the Bankruptcy Code are satisfied and certain additional conditions are met. These conditions are set forth in Section 1129(b) of the Bankruptcy Code, and require, generally, a showing that the Plan does not discriminate unfairly and that the Plan is "fair and equitable" with respect to each Class of Claims and Interests that is Impaired under, and has not accepted, the Plan. In order to be "fair and equitable" as required by Section 1129(b) of the Bankruptcy Code, the Plan must provide that Unsecured Creditors and Interest Holders in non-consenting, Impaired Classes will either receive or retain on account of their Claims or Interests, property of a value, as of the Effective Date of the Plan, at least equal to the value of such Claims or Interests or, if they receive less than full value, no Class with a junior priority will receive or retain anything on account of such junior Claim or interest. For Secured Creditors, the Plan will be "fair and equitable" under Section 1129(b) of the Bankruptcy Code if Secured Creditors either: (i) retain the liens securing their claims and receive deferred cash payments totaling at lest the allowed amount of their claims, to the extent of the value of the Secured Creditor's interest in such property as of the Effective Date of the Plan, (ii) if the property securing their claim is to be sold, their liens will attach to the proceeds, or (iii) Secured Creditors will receive the "indubitable equivalent" of their Secured Claims.

6

vi.        Dissenting Administrative Creditors. Pursuant to Bankruptcy
Code Section 1129(a)(9) unless the holder of a claim pursuant to Bankruptcy
Code Section 507(a)(1) receives cash in full payment of the claim or agrees
otherwise, the Plan cannot be approved.  This provision applies to Administrative
Claims approved in accordance with Bankruptcy Code Section 503, designated
in the Plan as Class 3.  Thus, unless all members of Class 3, the only impaired
class, consent to the treatment proposed under the Plan the Plan will not be
approved.  The Plan, however, provides that the Purchaser is obligated to pay
cash to satisfy dissenting Administrative Claims up to the aggregate sum of fifty
thousand dollars ($50,000), which will be deducted from payments under the
Plan to the Trustee.  If Administrative Claimants representing more than this
amount do not consent to the Plan, the Plan cannot be confirmed.

    If the Plan is not accepted by an impaired Class or Classes, the Debtor
will rely on the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code
and seek Confirmation of the Plan.  The Court will then decide if the Plan is fair
and equitable to the Creditors and Interest Holders.  No cram down is possible,
however, with respect to Administrative Claimants.

    These are complex statutory provisions and this summary is not intended
to be a complete statement of the law.  Creditors are encouraged to seek advice
from their own counsel with respect to the specific application of these principals
to the Plan.

## 3.    THE DEBTOR

a.    In General.

    The Debtor is a corporation organized and existing under the laws of the
State of Arizona.  The Debtor had three divisions at the Petition Date.  These
three divisions were as follows:

    i.    Tierra Division.  The Tierra Division held a license from Niaski, Inc.
to utilize certain patented technology in the remediation of ground contamination
(the "Niaski License").  The license extended to remediation projects which were
procured by the Debtor because of its designation as a Small Business
Administration 8(a) company.[6]  Thus, the projects for which the Debtor was
licensed by Niaski were Federal and State remediation projects.  Although the
Debtor attempted to market remediation services pursuant to the Niaski License,
the Debtor only procured one such project known as the "Beth Page Project".[7]
This project involved remediation of a site located in Beth Page, New York for the

---

[6]  The Debtor's designation as an 8(a) contractor has since expired.
[7]  Much of the marketing was undertaken by Edmundo Uribe and MCC Technologies, Inc. for
which the Debtor made payments which are now the subject of an Adversary Proceeding as more
fully described below.

7

United States Navy. The design of the Beth Page Project was provided under contract with MCC Technologies, Inc and Mr. Edmundo Uribe, owner of both MCC Technologies and Niaski. The Beth Page Project was undertaken pursuant to a contract with the United States Navy which called for remediation of subsoil heavy oil contamination (the "Beth Page Contract"). The Debtor was only successful in remediating some of the contamination and did not meet the performance standards set forth in the Beth Page Contract.[8] The Beth Page Contract was terminated in the summer of 2006 and all revenues from the Beth Page Contract have been collected by the Debtor. There is no prospect for further contracts relating to the Tierra Division, and the Tierra Division has ceased to operate. The Debtor did receive certification by the United States Navy for use of a process developed by MCC Technologies, Inc. and Niaski, Inc. to remediate perchlorate contamination, but the Debtor never obtained a contract to utilize this process.[9]

      ii.    <u>Arusi GC.</u> The Debtor undertook a general contracting activity to construct facilities under contract with the United States Department of Defense utilizing its 8(a) designation. At the Petition Date the Debtor was engaged in acting as general contractor for two construction projects for the United States Marine Corps in Yuma, Arizona (the "Yuma Projects"). These projects were bonded by Merchants Bonding Company. The general contracting business was unsuccessful, and Merchants Bonding Company absorbed a substantial loss on the Yuma Projects.[10] The Debtor has not entered into any further construction contracts, and the GC Division is no longer active. No bonding is available to the Debtor to allow it to bid on further general contracting work. There is no prospect

---

[8]   Failure of performance on the Beth Page Contract can be traced to the use of Government payments for purposes other than the project completion. The technology being utilized proved to be successful, but operations were allowed by the Debtor to lapse for appreciable periods of time, and the Debtor failed to pay subcontractors in a timely fashion.

[9]   The Debtor has brought suit against MCC Technologies, Inc. for all amounts paid for services rendered pursuant to the contract between the Debtor and MCC Technologies, Inc. with respect to the Beth Page Project and other payments to Edmundo Uribe and MCC Technologies, Inc.. This suit is further described below, but counterclaims have been filed by MCC Technologies, Inc. and Niaski, Inc. including a claim that the Debtor did not pay amounts due under the license granted by Niaski to the Debtor.

[10]   The precise extent of the loss is difficult to determine. Merchants Bonding Company was obligated to pay Pre-petition contractors for work the Debtor had not yet paid. Funds derived from the Yuma Projects were used by the Debtor for purposes other than paying the subcontractors and suppliers on the job. To the extent that Merchants Bonding Company paid Pre-petition claims of suppliers and subcontractors, Merchants Bonding Company has obtained their rights against the Debtor. The Yuma Projects were completed Post-petition. The costs incurred in the Post-petition period have been treated by the Debtor as Pre-petition claims apparently with the agreement of Merchants Bonding Company. Thus, the balance sheet of the Debtor reflected an ever increasing Pre-petition unsecured debt until the Yuma Projects were completed. Additionally, there were a series of stipulations and orders relating to the use by the Debtor of the cash which served as collateral for Merchants Bonding Company; i.e. the payments received by the Debtor for the Yuma Projects. In return for use of this cash collateral, the Debtor granted to Merchants Bonding Company a secured Post-petition claim which is believed to be $160,000 secured by all the assets of the Debtor.

8

for further construction contracts to be awarded to the Debtor, particularly since the Debtor no longer holds an 8(a) designation.

     iii.     <u>EDM Division</u>. The Debtor through its EDM Division provides limited engineering services principally to public utilities. The EDM Division has as its principal customers Salt River Project ("SRP"), Central Arizona Project ("CAP"), Southwest Gas ("Southwest"), and to a lesser extent Arizona Public Service ("APS"). The EDM Division provides these services under master contracts, but these contracts do not specify how much work will be received by the Debtor. Rather, these contracts specify the fees which may be charged by the Debtor, but the allocation of work to the Debtor is dependent upon the needs of the public utility.

     The work allocated to the EDM Division by its customers remained basically consistent during the period 2003 through 2005. However, based on the work completed in each period, the amount of work allocated by the Debtor's customers declined in 2007. The average monthly work completed by the EDM Division for customers has been as follows:

| Period | Average Monthly Gross Sales[11] |
|---|---|
| 2003 | $153,492 |
| 2004 | $154,894 |
| 2005 | $148,313 |
| January 1, 2007 – August 28, 2007 | $128,089 |

     The activities of the EDM Division are the only continuing business of the Debtor. The Debtor has shown operating losses from the operations of the EDM Division since the Petition Date. The only source of revenue for the EDM Division is charging fees to its customers for services rendered. The amount of revenue that can be generated is limited by the number of personnel working and performing services for the Debtor's customers. The number of personnel engaged in providing services to produce revenue has been reduced substantially since the Petition Date thereby limiting the possibility of increasing gross revenues of the Debtor. The Debtor does not have working capital sufficient to increase its workforce and thereby expand its business.

b.     <u>Factors Precipitating Chapter 11 Filing.</u>

---

[11] The source of this information is the "Tracker System" which is an internally maintained system for recording work flows of the EDM Division and from which payroll is prepared. Prior to the termination of the GC Division and the Tierra Division, the Sales and Cost of Sales associate with the EDM Division are difficult to isolate from the financial statements of the Debtor. The information from the Tracker System, however, provides date relating only to the work completed by the EDM Division. For the period January, 2006 through December 31, 2006 there is insufficient data available to the Proposing Creditor to make a determination of the Sales of the EDM Division alone from the Tracker System date. Exhibit G provides the Tracker System information for 2003, 2004, 2005 and the period January 1, 2007 through August 13, 2007. A comparison of the customer base of the Debtor during these periods can be made from Exhibit G.

9

There are numerous factors which contributed to the necessity of filing the Petition. All of these factors cannot be fully stated here. However, several factors stand out as contributing to the financial position of the Debtor in June, 2005.

Unavailability Of Credit Or Third Party Equity Capital. In June, 2005 the Debtor had a line of credit with Bank One (now JP Morgan Chase) with a credit limit of $250,000 and no available credit by May, 2005. Cynthia Reynoso, a minority shareholder of the Debtor, and Alejandro Reynoso, the sole director and chief executive officer of the Debtor before the Petition Date and after the Petition Date of the Debtor-In-Possession, were engaged in a divorce action by May, 2005. Cynthia Reynoso obtained a Temporary Restraining Order and subsequent Preliminary Injunction precluding the Debtor from seeking any further financing, either debt or equity, thus making it impossible for the Debtor to obtain funds to meet its current obligations through outside sources.

Insolvency Of The Debtor. In May, 2005 the Debtor was insolvent in that it was unable to meet its current obligations. Substantial Creditors of the Debtor were unpaid as of May, 2005, the Debtor had no further available credit facility, and the Debtor had little cash reserves for payment of payroll and other essential expenditures necessary to continue operations. Cash, Accounts Receivable, and other liquid assets were inadequate to meet the current debt obligations of the Debtor as of the Petition Date. The Debtor had Work-In-Process which, if completed, could provide additional liquidity, but the completion of such work was in jeopardy because cash was not available to meet payroll on a consistent basis. Even if completed, Work-In-Process would not provide adequate liquidity for continued operations of the Debtor and payment of current Creditors. As of the Petition Date, the Debtor was unable to pay its current obligations based on the current liquid assets (consisting of cash and trade Accounts Receivable) available for liquidation in comparison to its current liabilities (consisting of trade payables and a bank line of credit) as follows, as reflected on the Petition Schedules:

| | |
|---|---|
| Total Liquid Assets | $  742,033.90 |
| Total Current Liabilities | $1,542,487.61 |

Uncompleted Construction Projects. The Debtor was engaged in several uncompleted construction projects under contract with the United States Department Of Defense (the "Yuma Projects"). The United States had not withheld retainage from billings by the Debtor on work billed for the Yuma Projects, but the Debtor had withheld retainage from its subcontractors in spite of the certification to the Department of Defense to the contrary. Although this retainage was to have been set aside for payment to suppliers and subcontractors upon completion of the Yuma Projects, such retainage had been spent for other purposes and was no longer available. The retainage used by the

10

Debtor Pre-petition for other purposes totaled approximately $88,000 in May, 2005.

Unpaid Current Obligations. As of the Petition Date the Debtor had substantial unpaid Creditors payment to which was past due and the timing of receipt of payment from customers on outstanding receivables could not be projected with certainty. Among the unpaid Creditors were suppliers and subcontractors on the Yuma Projects. These subcontractors were owed in excess of $500,000 at the Petition Date although the Debtor had certified under oath to the United States that all suppliers and subcontractors had been paid.

Lack Of Available Cash. Payroll for the Debtor at the Petition Date was approximately $100,000 per month. At the Petition Date, the Debtor had cash totaling $128,354.44 which was sufficient, if no other bills were paid, to meet payroll for only a little over one month. However, all available cash was required to meet immediate Creditors demands so that the Debtor did not expect to be able to meet its next payroll without protection from current Creditors at the time of filing the Bankruptcy Petition.

Principal Reasons For Insolvency. The insolvency of the Debtor at the Petition Date was attributable to several factors including, but not limited to, the following: The insiders, including Alejandro and Cynthia Reynoso, removed from the Debtor in the form of payments to themselves and for their benefit over and above their salaries and benefits amounts in excess of the total net income of the Debtor for the years 2000, 2001, 2002, 2003, 2004 and prior to the Petition Date in 2005. Operations of the Debtor were funded by addition of debt which debt totaled $1,542,487 on the Bankruptcy Petition.

1.    Declining Operating Profits. During the calendar year 2004 and the period from January 1, 2005 through April 30, 2005, Net Income of Arusi declined from approximately $230,000 in 2003 to a loss of almost $245,000 in the first four months of 2005.[12]

2.    Withdrawal Of Cash By Insiders. During the period January 1, 1999 through April 30, 2005 non-payroll cash distributions were made to Alejandro Reynoso totaling in excess of $798,900.[13] These withdrawals were reflected on the books and records of the Debtor as loans or as shareholder withdrawals. During the same period Cynthia Reynoso received non-payroll disbursements from the Debtor totaling in excess of $117,000.

3.    Cash Transfers To Golden Anvil, a Mexican Mining Company. During the period January 1, 2000 through April 30, 2005 cash payments were made to or on behalf of Golden Anvil, Inc., a Mexican mining

---

[12]   Based on internally generated income statements and including all divisions of the Debtor.
[13]   Excluding disbursements to Golden Anvil, Inc. for stock of that company which were paid by the Debtor but the stock issued in the name of Alejandro Reynoso, as more fully described below.

11

company ("Golden Anvil"), totaling $777,087.38. These expenditures were in exchange for common stock of Golden Anvil and a promissory note. Most of the common stock of Golden Anvil was issued in the name of Alejandro Reynoso, and Alejandro Reynoso and Cynthia Reynoso have claimed ownership of such stock.[14]

        4.      Unsuccessful Business Ventures. The Debtor expended funds to explore business ventures beginning in 2000 which required cash from the Debtor[15]. These expenditures included, but were not limited to the following areas or enterprises: (i) Various environmental technologies which the Debtor never utilized commercially including expenditures for he development of a remediation regime for prechlorate contamination; (b) Unsuccessful efforts to market the environmental technology licensed by the Debtor from Niaski; (c) Unsuccessful efforts to find and acquire mining rights in Mexico for precious metals; and (d) Efforts to develop and market fertilizer products using humate.

c.      Debtor's Recent Financial Results.

        1.      Profit From Operations. Attached hereto as Exhibit A is a schedule reflecting the operating results of the Debtor since the Petition Date.[16] Termination of the operations of the Tierra Division and the GC Division occurred in approximately June, 2006.[17] The period July, 2006 through July, 2007 principally reflect income and expense of the EDM Division, the only continuing operations of the Debtor. Therefore, the recent financial results of the Debtor are most broadly judged by the operating results for the period July 1, 2006 through July 31, 2007, a period of thirteen months. Attached as Exhibit B is a month by month schedule reflecting the details of the Debtor's Income Statements for the period July 1, 2006 through July 31, 2007.

      For the period July 1, 2006 through July 31, 3007 the Debtor had average monthly sales of $147,918.87; cost of sales averaged $87,817.95 per month; and operating expenses averaged $105,098.78. Thus, the average monthly operating loss of the Debtor for the thirteen month period was $44.997.88.

---

[14] Recently, in the divorce case of Alejandro and Cynthia Reynoso, the stock of Golden Anvil, Inc. for which all payments came from the Debtor was considered part of the marital estate and divided between Alejandro and Cynthia Reynoso by the domestic court.

[15] There is evidence that after Cynthia Reynoso filed for divorce against Alejandro Reynoso the intent was for the Debtor to pay for development of businesses which Alejandro Reynoso would ultimately own to avoid claims of Cynthia Reynoso.

[16] Exhibit A reflects various averages for periods which a Creditor might find relevant in evaluating the recent operations of the Debtor, including the period from July 1, 2006 through June 30, 2007 and September 1, 2006 through June 30, 2007. The reasons for viewing the recent financial results of the Debtor from the perspective of these various time frames will be discussed more fully below.

[17] The last payment received pursuant to the Yuma Contract was in October, 2006 for $20,000, and the last payment from the Beth Page Contract was in March, 2007 for $40,000. There were no other payments with respect to either the Tierra Division or the G C Division during the period.

12

Over the previous thirteen months, the Debtor has suffered operating losses totaling $584,972 and since the Petition Date the Debtor has suffered operating losses totaling $1,975,354.

The Cost Of Sales, including salaries and payments to subcontractors, represents on average 59% of Gross Sales during the period July 1, 2006 through July 31, 2007. By contrast, the Cost Of Sales was 63% of Gross Sales for the period July 1, 2006 and June 30, 2007, and 64% for the period September 1, 2006 through June 30, 2007.[18]

Administrative expenses, after reductions made by the Trustee, are approximately $75,000 per month. Thus, it requires approximately $202,500 in Gross Sales every month for the Debtor to break even at a 63% cost of sales, and at a 59% Cost Of Sales, the break even point is $184,500.[19] The Debtor has averaged for the period July 1, 2006 through July 31, 2007 Gross Sales of $147,918 per month.

Gross Sales of the EDM Division are produced by hours worked by employees, and are dependent upon the amount of work assigned to the Debtor by its customers. The Debtor has increased productivity in that it is producing Gross Sales at approximately historical levels with fewer employees. However, the EDM Division has never historically been able to produce sufficient Gross Sales to operate profitably.[20]

　　　　2.　　Assets, Liabilities, And Shareholder Equity. Attached as Exhibit C is a schedule reflecting the Balance Sheet of the Debtor since the Petition Date.

The result of continuing operating losses has been the reduction of current assets by $613,269 since the Petition Date. Total liabilities increased by $371,628 during the same period. Total liabilities at the Petition Date were $1,542,487.61 as compared to $1,914,116 as of July 31, 2007.

Shareholder's equity declined since the Petition Date by $1,110,362 to a negative $370,486.

---

[18] These variances reflect the fact that the EDM Division receives work from its customers which it performs at various speeds. Thus, costs in performing services for the customers are many times absorbed in previous months, often many months before billing. Also, the customer must approve the timing of billing to it in some cases, and therefore the connection between when costs are incurred and when billing occurs is exacerbated. There are instances when a large number of jobs are at a high rate of completion and can be completed and billed with little more Cost Of Sales required. These anomalies occur from time to time, and they can skew the actual financial results of the Debtor as Reported. Thus, the month of July, 2007 represents such a month. A truer picture of Cost Of Sales can be obtained by considering the period July 1, 2006 through June 30, 2007 when calculating the most likely ongoing percentage of Gross Sales which will be needed to pay Cost Of Sales.

[19] Since the Petition Date the Cost Of Sales has averaged approximately 90% of Gross Sales, and administrative costs have averaged approximately $123,000 per month.

[20] The historical Gross Sales are reflected above.

13

At the Petition Date Total Assets were $2,282,364.58 as compared to $1,543,630 as of July 31, 2007. Particularly, Accounts Receivable have declined by $335,766 since the Petition Date.

It is impossible to evaluate the recent results of the Debtor's operations and the declines in the Debtor's balance sheet without reference to the payments from CNA Insurance arising from a flood in the Debtor's premises.

On September 3, 2006 the facilities of the Debtor sustained a minor flood due to a broken pipe. The Debtor's operations were moved to an adjacent location and the Debtor was in full operation within several days. The damage was relatively minor. However, the Debtor completely gutted the inside of the premises and reconstructed the entire facility. Most of the new improvements were leasehold improvements which have no substantial marketability. Some new equipment was also purchased. The Debtor made claims against CNA Insurance for damage as well as lost profits during the reconstruction period. CNA has initiated an investigation of potential fraud by the Debtor in its insurance claims.

The Debtor received in excess of $751,000 of insurance proceeds during the period September, 2006 through June, 2007. The net book value of property, plant and equipment increased primarily as a result of the insurance proceeds by $253,316 during that period. However, total current assets decline during the same period by $239,573 and total liabilities declined by only $20,929. Thus, operations of the Debtor were heavily subsidized by the insurance proceeds from September, 2006 through June, 2007 and without such insurance proceeds the Debtor would have been unable to continue its operations. Furthermore, the decline in Accounts Receivable reflects a general decline in the amount of business actually conducted by the Debtor during the period.

3. Business Activity. The Debtor has experienced during its recent operations a decline in business activity. The Debtor provides services principally to a limited number of customers, principally Southwest Gas, Salt River Project, and Central Arizona Project. The Work-In-Process as measured by the Tracker System[21] represents the assigned projects from these customers upon which the work has not been billed to the customers. The Accounts Receivable represent the work completed and billed to the customers but not yet paid. Declining Accounts Receivable while Work-In-Process increases indicates work has been assigned by the customers at a greater rate than the work is completed and paid. Increasing Accounts Receivable while Work-In-Process declines indicates work is being completed and billed but not replaced by assignments from the customers and payments by the customers. Declining

---

[21] The Tracker System is an internally maintained project tracking system from which payroll for personnel working on projects for customers is derived and which tracks the Work-In-Process. When a project is assigned by a customer, the value of the project is entered into the Tracker System. When work is performed on the project, the work is entered into the Tracker System.

14

Accounts Receivable combined with declining Work-In-Process indicates a deterioration in the Debtor's business.

From month to month there may be anomalies because work substantially completed in prior periods may be finished within a short time and billed in the current period thus increasing Accounts Receivable and Gross Sales.

Attached as Exhibit E is a schedule reflecting the data from the Tracker System available to the Proposing Creditor. The total Work-In-House declined from February 22, 2007 to August 13, 2007 from $378,182 to $311,408. Of the Work-In-House on August 13, 2007 the work remaining uncompleted totaled only $250,993. It is apparent that in order to generate Gross Sales at a break even level, a significant portion of the Work-In-House would need to be completed and billed. There is not sufficient Work-In-House to support ongoing break even operations of the Debtor.

From the end of February, 2007 to the end of July, 2007 Accounts Receivable increased by approximately $22,136.[22] The increase in Accounts Receivable and the decline in Work-In-House over these roughly equivalent periods shows that the Debtor stripped out the Work-In-House in July to obtain the Gross Sales reported for July, 2007 but left only a small amount of Work-In-Process remaining. The end result is that the Tracker System data shows the Debtor cannot continue to show Gross Sales similar to those reported in July, 2007 simply because the Debtor does not have the work from its customers to do so.

4.  Operating Cash Flow. Cash flow is calculated by adding to reported operating profit or loss the non-cash expenses incurred during the period. The principal non-cash item in the case of the Debtor is depreciation. During the period July 1, 2006 though July 31, 2007 the Debtor has experienced negative cash flow from its operations of $484,753. This negative cash flow has been overcome by the Debtor only by the infusion of substantial cash in the form of CNA Insurance proceeds. The Debtor has used such insurance proceeds to remain in business and cover shortfalls in cash flow.

d.  Actions Taken to Improve Operations.

1.  Accounting And Internal Controls. The accounting and Internal controls have not apparently been strengthened by the Debtor. The Report for June, 2007 indicates that there has not been appropriate or consistent accounting for the insurance proceeds from CNA. There appears on the income statement for June, 2007 "Other Income" of $457, 941. There are notes to explain this entry which are not accurate. Apparently, the income was accrued in

---

[22]  The Proposing Creditor does not have access to the books and records of the Debtor and the Debtor does not report its Work-In-Process. The Proposing Creditor does not have information sufficient to present the detailed Work-In-Process figures for each month of recent operations.

15

June, 2007 by treating amounts previously booked as liabilities as income. The appropriateness of such an entry under GAAP Accounting Principals is questionable, particularly in light of the fact that the accrual appears to relate to payments from CNA Insurance which may have been procured by fraud of the Debtor.[23] There appear to also have been adjusting entries which are not fully explained in the Reports.

A particular anomaly appears in the Reports for June, 2006. In that month gross sales totaling $3,532,639 were reported along with cost of sales totaling $4,405,553. The entries appear to be an attempt to recognize the loss on the Yuma Projects. The losses from the Petition Date until December 31, 2005 were eliminated from the Reports beginning in January, 2006. None of these entries appears to be in accordance with GAAP accounting principals. There has been no effort by the Debtor to clarify these anomalies in its books and records and the Reports.

Notes Receivable represent in part pre-petition amounts owed by insiders to the Debtor as set forth in the Schedules accompanying the Debtor's Petition, as amended (the "Bankruptcy Schedules"). At the Petition Date the amount of Notes Receivable was $242,000. There were no Noted Receivable reported during the period March through June, 2006, indicating that the Promissory Note owed by Alejandro Reynoso had been paid to the Debtor. However, by July, 2007 Notes Receivable reappeared on the Balance Sheet but had increased to $375,808.67. Assuming the reappearance of the Notes Receivable included the Promissory Note of Alejandro and Cynthia Reynoso that had clearly not been paid, the Reports indicate that while the Debtor has been operating under Chapter 11, some $133,000 of additional loans were made presumably to insiders. There is no adequate explanation in the Reports for this increase.[24]

The appointment of the Trustee on May 24, 2007 may lead to institution of adequate controls and accounting systems in the future, but there is no indication that the Trustee has undertaken an active effort to institute such controls up to this point. The Trustee has declined to explain to the Proposing Creditor the entries on the June 2007 Report when requested to do so by the Proposing Creditor.

2.    Elimination Of Businesses.  Since the Petition Date the general contracting operations conducted by the Debtor's GC Division of the Debtor have ceased. The elimination of this business was necessitated by the inability of the Debtor to obtain further bonding and the expiration of Small Business Administration 8(a) designation of the Debtor. The Debtor lacked the capability

---

[23]  The matter of the insurance proceeds from CNA Insurance is discussed more fully below in the analysis of assets and liabilities of the Debtor.
[24]  See discussion of specific assets of the Debtor below.

Case 2:05-bk-10489-GBN    Doc 419    Filed 08/30/07    Entered 08/30/07 12:30:42    Desc
Main Document    Page 16 of 40

to profitably complete the Yuma Projects and does not have the capability to undertake further such projects.

Since the Petition Date the environmental operations of the Debtor conducted by the Tierra Division of the Debtor have ceased. The Debtor failed to successfully complete the Beth Page Project and was, therefore, unable to collect fully under the Beth Page Contract. The Beth Page Contract provided for $1.5 Million in total payments to the Debtor based upon performance. MCC Technologies, Inc. proposed to complete the project on a "turn key" basis for $500,000 but the Debtor declined. The failure of the Beth Page project was due to the mismanagement of the Debtor and failure to pay critical bills relating to the project such as for chemicals, testing and equipment repair. Funds collected pursuant to the Beth Page project were generally used for other purposes. The Debtor has no ongoing ability to obtain environmental remediation contracts.

While two of the three business conducted by the Debtor Pre-petition have been permanently closed, the remaining EDM Division Gross Profits are not sufficient to pay the Operating Costs of the Debtor. In the final analysis, of the Debtor's three business activities as of the Petition Date, two were incapable of producing Gross Profit, and the one activity which was capable of producing Gross Profit could not pay the Operating Costs without substantial reduction in such Operating Costs. Although there has been some progress in reducing Operating Costs, such costs cannot be reduced sufficiently to allow the Debtor to operate at a break-even point without a substantial expansion of its engineering business. Such expansion is precluded because working capital is not available to the Debtor for such purpose, and the actual Work-In-Process coming from existing customers is declining.

3.    New Business. The Debtor has not attracted new engineering business since the Petition Date.   The Debtor has not expanded its customer base, and the amount of business from its principal customers, including Southwest Gas, Central Arizona Project, and Salt River Project, have declined. The Debtor has entered into a joint venture with another provider to obtain a contract for expanded work from Central Arizona Project, but the Debtor will not achieve substantial increase in Sales even if the contract is granted as the Debtor will provide only limited services on an hourly basis and the Debtor does not have the personnel to expand its Sales substantially and no working capital to expand its work force appreciably. The Work-In-Process has declined appreciably in 2007.

4.    Operating Expenses. Exhibit B includes a detailed statement of the Operating Expenses incurred by the Debtor from July 1, 2006 through July 31, 2007. For the period July 1, 2006 through July 31, 2007 the average Operating Expenses per month were $105,099. Operating Expenses reported in June, 2007 and July, 2007 were $76,660 and $72,675, respectively.   However, the Debtor has not reduced its Operating Expenses commensurate with its declining

17

business.    Total Operating Expenses excluding Professional Fees and
            The Debtor has made decisions which preclude it from reducing its
Operating Expenses appreciably in the future. Particularly, the Debtor entered
into a new five year lease for its current location even though the current offices
are substantially unused at the current level of the Debtor's business and there is
no working capital available to the Debtor to increase its business activity and no
prospects for expanding the business to fully utilize the space which has now
been leased on a long term basis.

c.      Debtor's Continuing Viability.  Under the current circumstances the Debtor
is not a viable concern.  No further insurance proceeds can be anticipated to
subsidize the operations of the Debtor.  The Debtor is operating at a loss, and
has negative cash flow.  There is no opportunity to substantially reduce
Operating Costs, and the Cost Of Sales is not likely to be reduced as a
percentage of Gross Sales.  Sustained Gross Sales of about $150,000 per month
have long been the best that can be achieved by the EDM Division historically.[25]
There has been no expansion of the customer base and actually a declining
Work-In-Process and Accounts Receivable which indicates a declining
business.[26]  The Debtor has suggested no way of increasing Gross Sales, and
has presented no Plan Of Reorganization since the Petition Date which would
suggest a way of continuing the Debtor as a viable operating entity.

## 4.      MAJOR EVENTS IN CHAPTER 11 CASE.

        The Petition In Bankruptcy was filed on June 10, 2005.  The then current
management of the Debtor, controlled by Alejandro Reynoso, remained as the
Debtor-In-Possession until an order of the Court dated May 25, 2007 appointing
Mr. Dale Ulrich as Chapter 11 Trustee (the "Trustee").  Appointment of the
Trustee was supported by the Office of the United States Trustee and the
Proposing Creditor.  Mr. Terry Dake was appointed counsel for the Trustee.

        On August 16, 2005 the law firm of Lewis and Roca was appointed
counsel for the Debtor-In-Possession.  Lewis and Roca withdrew as counsel to
the Debtor-In-Possession and the Court approved the withdrawal by order dated
May 1, 2007.  From the Petition Date to the withdrawal of Lewis and Roca, none
of the claims of the Bankruptcy Estate against Alejandro Reynoso or his family
were pursued by the Debtor-In-Possession.

---

[25]  See Exhibit G which sets forth, utilizing the Tracker System, reflects the actual work
completed by the EDM Division for various periods isolating the Sales generated by the EDM
Division from the other activities of the Debtor.
[26]  See Exhibits E and G.

18

A series of orders authorizing the use of cash collateral have been entered by the Court.[27] These "Cash Collateral Orders" have permitted the use by the Debtor-In-Possession and by the Trustee of funds from the Yuma Projects in which Merchants Bonding Company has a secured interest. Pursuant to the Cash Collateral Orders, Merchants Bonding has obtained a secured claim against the Bankruptcy Estate totaling approximately $160,000.[28]

At the Petition Date, Bank One had a secured claim against the Bankruptcy Estate secured by a piece of real estate located on Buckeye Road in Phoenix, Arizona and various vehicles. The court approved a sale of the Buckeye Road property and the secured claims were paid in full from the proceeds of the sale of real estate and vehicles in March, 2006. Priority claims of Bank One were fully paid as well in May, 2006.

While not appointed as counsel to the Trustee, Mr. William R. Richardson filed a series of Adversary Proceedings against various parties purportedly on behalf of the Bankruptcy Estate. None of these suits to date appear to have been served on the respective defendants. However, one defendant has filed answer and counterclaims against the Bankruptcy Estate.[29]

## 5. SUMMARY OF DEBTOR'S ASSETS AND LIABILITIES.

a. <u>Assets And Liabilities As Of The Petition Date.</u> The Debtor had the following assets as of the Petition Date, based on the Amended Schedules filed by the Debtor with the Bankruptcy Court:

| | |
|---|---|
| Cash | $ 128,344.54 |
| Accounts Receivable | $ 613,679.46 |
| Notes Receivable | $ 242,510.55 |
| Prepaid Expenses | $ 135,980.99 |
| Other Assets | $  455,031.79 |
| Total Current Assets | $1,575,547.33 |
| | |
| Net Property, Plant & Equipment | $  405,717..25 |
| Due From Insiders | $      1,100.00 |
| Real Property | $  300,000.00 |
| Total Assets | $ 2,282,364.58 |

---

[27] The most recent "Cash Collateral Order" was issued on August 22, 2007 extending the order of October 4, 2006. Essentially, the new Cash Collateral Order calls for a payment to Merchants Bonding of $50,000 and use of the remaining cash collateral so long as operating losses in any two months out of a total of four consecutive months do not exceed $10,000. A continued hearing on use of cash collateral is scheduled for February 21, 2008.

[28] The secured claim of Merchants Bonding will be reduced by the payment ordered by the Court on August 22, 2007.

[29] See description of the Adversary Proceedings below.

The Notes Receivable represented an unpaid promissory note of Alejandro and Cynthia Reynoso relating to amounts previously withdrawn from the Debtor due to be paid on December 31, 2005. No payment has been made, and neither Alejandro nor Cynthia Reynoso have assets with which to pay this promissory note. An Adversary Proceeding has been brought by the Estate to recover on the promissory note, but it is not clear whether this Adversary Proceeding will be pursued or what benefit, if any, will result from pursuit of Mr. and Mrs. Reynoso.[30]

Other Assets included various vehicles, some of which have subsequently been sold by the Bankruptcy Estate to satisfy secured and priority claims. Also, listed as property of the Bankruptcy Estate were the following, which were not included in the balance sheet as no value could be assigned to them:

      i.      An interest in 112,250 shares of Series A and 4,258,917 shares of Series B stock of Golden Anvil, Inc., a Mexican mining company, which were issued in the name of Alejandro Reynoso. A related claim against Golden Anvil, Inc. was listed for payments made to or on behalf of Golden Anvil estimated at $800,000.[31]

      ii.      An interest in 75,000 shares of Can-Cal Resources, Ltd. held by certain insiders.[32]

      iii.      Various claims against MCC Technologies, Inc., Edmundo Uribe, Eduardo Alonzo.[33]

The Real Property listed was identified as the Buckeye Land which has subsequently been sold. The net proceeds of sale were used to pay the pre-petition secured claims, and the remainder was retained by the Bankruptcy Estate. Property, Plant and Equipment included various leasehold improvements, computers and other equipment, and vehicles of the Debtor as of the Petition Date.

The liabilities at the petition date included:

      i.      Secured Debt, principally secured by the Real Property and various vehicles, which was fully satisfied upon the sale of these assets in accordance with orders of the Court.

---

[30] See Adversary Proceedings below.
[31] Mr. Reynoso has admitted in open court that he holds the stock of Golden Anvil, Inc. issued in his name for the Debtor, and that he owes the $242,000 Promissory Note. Additional shares of stock and a promissory note have been issued by Golden Anvil, Inc. in the name of the Debtor which Mr. Reynoso holds and has not turned over to the Bankruptcy Estate. See Adversary Proceedings below.
[32] See Adversary Proceedings below.
[33] See Adversary Proceedings below.

ii.     Priority Debt which has subsequently been paid by the Debtor.

iii.     Unsecured Debt, including unpaid subcontractors on the Yuma Projects which were indirectly secured by Merchants Bonding Company obligation to the United States to pay all such subcontractors under the bond issued by Merchants.

Total Pre-petition liabilities remaining unpaid as of June 30, 2007 of all classes were $1,542,487.61. All such liabilities are unsecured.

b.     Assets As Of July 31, 2007.  After slightly over two years of operating under the management of the Debtor-In-Possession and the Trustee, the assets of the Debtor were reported to be as follows:

| | |
|---|---:|
| Cash | $ 283,838.98 |
| Accounts Receivable | $ 277,913.65 |
| Notes Receivable | $ 375,808.67 |
| Prepaid Expenses | $ 24,716.04 |
| Other Assets | $ 0.00 |
| Total Current Assets | $ 962,277.34 |
| | |
| Net Property, Plant & Equipment | $ 441,617.83 |
| Due From Insiders | $ 0.00 |
| Real Property | $ 0.00 |
| Other Assets | $ 139,734.70 |
| Total Assets | $ 1,543,629.87 |

By July 31, 2007 the value of assets reported had declined by $738,734 from the value of assets of the Debtor on the Petition Date. Current Assets had declined by $613,270 from the Petition Date.

Included in the Current Assets as of June 30, 2007 were Notes Receivable totaling $375,808.67, including the $242,000 promissory note from Alejandro Reynoso and Cynthia Reynoso and apparently other lending in the Post-petition period by the Debtor which is not explained in the Reports.[34]  The financial condition of Alejandro Reynoso and Cynthia Reynoso has deteriorated

---

[34]  For the period March through June, 2006 the Debtor reflected no notes receivable, indicating the promissory note of Alejandro and Cynthia Reynoso was removed from the Debtor's books without being paid. In July, 2006, without explanation, notes receivable reappeared on the Debtor's balance sheet in the amount of $370,451.46 and remained the same until March, 2007 when reported to be $376,146.43. It is assumed that all notes receivable are due from Alejandro Reynoso or members of the Reynoso family and represent withdrawals from the Debtor by Mr. Reynoso or his family in the Post-petition period.

21

since the Petition Date to the point where the collectibility of the promissory notes from them is questionable.[35]

Net Property, Plant and Equipment was adjusted according to the June, 2007 Report to reflect actual basis after eliminating those assets lost in the flood as of December 31, 2006 and adding improvements paid from the CNA Insurance funds. Furthermore, adjustments to accumulated depreciation were affected. Thus, according to the Report, as of June 30, 2007, the net book value was correct. Presumably the same is true of the amount reported as of July 31, 2007.

The Proposing Creditor is unable to determine the extent to which the Net Property, Plant and Equipment represents leasehold improvements. However, approximately $250,000 is believed to represent leasehold improvements which upon liquidation would have little or no value to the Bankruptcy Estate.[36]

Other Assets are not detailed in the Reports, and the Proposing Creditor does not know the nature or value of such reported Other Assets.

As of July 31, 2007 various Adversary Proceedings had been brought by the Trustee, which are more fully described below. These Adversary Proceedings are not included as assets in the Balance Sheet of the Debtor, but their respective value is of importance in considering the liquidation value of the Debtor and the propriety of the proposed Plan of Reorganization.

---

[35] The shareholders equity in the Debtor which was a major asset of Alejandro and Cynthia Reynoso at the Petition Date has been rendered worthless as explained herein. Alejandro and Cynthia Reynoso guaranteed the bond issued by Merchants Bonding Company on the Yuma Projects, and Merchants Bonding Company has placed a lien on the Reynoso's residence, their other major asset at the Petition Date. Alejandro Reynoso's retirement account has been depleted by various payments to Creditors of the Debtor, and the vehicle owned by Cynthia Reynoso at the Petition Date has been repossessed. It is not believed that Alejandro or Cynthia Reynoso have the ability to pay the notes reflected as the asset "Notes Receivable" on the balance sheet of the Debtor as of July 31, 2007.

[36] The improvements to the leasehold are not specifically designated as such in the Reports. However, after the flood in October, 2006 the entire premises of the Debtor were gutted and rebuilt with insurance proceeds. CNA Insurance is investigating the propriety of the claims to replace leasehold improvements which were not actually damaged by the flood. Nevertheless, according to the notes in the Report for June, 2007 the Trustee has indicated the fixed asset accounts have been adjusted and reconciled to reflect the facts as of that time. The Trustee's note to the Balance Sheet on the June, 2007 Report indicates that $230,000 was previously taken into income in December, 2006, but that is not the case according to the Report for December, 2006. The Proposing Creditor believes that the $230,000 referenced by the Trustee in the June, 2007 Report represents an amount which approximates the cost of construction of the leasehold improvements funded by insurance proceeds, and that a reasonable estimate of the portion of Net Property, Plant and Equipment reflected on the Report for July, 2007 represents leasehold improvements. The Trustee has declined to clarify the note on the June, 2007 Report when requested to do so by the Proposing Creditor.

c.  Liabilities As Of July 31, 2007.  According to the Report for July, 2007, the liabilities of the Debtor as of June 30, 2007 were as follows:

| Post-Petition Liabilities | | |
|---|---|---|
| Accounts Payable | $ | 380,505.90 |
| Taxes Payable | $ | 48,383.21 |
| Notes Payable | $ | 18,514.62 |
| Professional Fees | $ | 0.00 |
| Accrued Liabilities | $ | 44,987.70 |
| Secured Debt | $ | 0.00 |
| Other Debt | $ | 0.00 |
| Total Post-Petition Liabilities | $ | 492,391.43 |
| Pre-Petition Liabilities | | |
| Secured Debt | $ | 0.00 |
| Priority Debt | $ | 0.00 |
| Unsecured Debt | | $1,421,724.30 |
| Total Pre-Petition Liabilities | | $1,421,724.30 |
| | | |
| Total Liabilities | | $1,914,115.73 |

Included within Accounts Payable as of July 31, 2007 is $274,482.34 owed to Lewis and Roca, former attorneys for the Debtor-In-Possession.  Lewis and Roca has filed a claim seeking Court approval for an additional fees and costs totaling $121,502.63 bringing the total claim of Lewis and Roca to $395,984.57.

Also included in Accounts Payable is $18,014.02 purported to be owed to Alejandro Reynoso.  In light of the fact that Alejandro Reynoso and Cynthia Reynoso owe substantial amounts to the Estate, it is unlikely that this claim will ultimately be approved.

The Adversary Proceedings may subject the Estate to counterclaims and sanctions which could give rise to additional liability of the Estate, as more fully described below.  Additionally, CNA Insurance has initiated an investigation of possible fraud in claims by the Debtor-In-Possession relating to the flood of the Debtor's premises on October 3, 2006.  The extent of the claims which may be the result of this investigation is not clear at this time.  CNA Insurance is expected to exert two claims of fraud on behalf of the Estate:  First, that the Estate made claims for repairs and losses of physical assets beyond those which were caused by the flood.  Second, that the Estate claimed loss of profits for a period far in excess of the actual disruption of its business and far in excess of the actual lost profits.

The Debtor has other potential liabilities, including the obligation on a five year lease executed on the premises now occupied by the Debtor in February,

23

2007, more fully described below. Furthermore, there are no Trustee fees included in the reported liabilities of the Debtor nor is there any liability associated with fees for counsel relating to pursuit of the Adversary Proceeding.[37]

The Taxes Payable does not appear to include continuing interest and penalties on unpaid employment taxes from the fourth quarter of 2005 which remain unpaid, and there is a secured claim of Merchants Bonding pursuant to various Cash Collateral Orders estimated at $160,000 which is not reflected in the reported balance sheet.[38]

5.      **Adversary Proceedings.**

Upon the appointment of the Trustee, Mr. Richardson, who was being paid by Alejandro and Cynthia Reynoso, attempted to be appointed as special counsel for the Estate to pursue various claims. The attempt by Mr. Richardson appears to have been an effort to benefit the Reynoso family and the Adversary Proceedings filed by Mr. Richardson against members of the Reynoso family reflect this purpose. The Court declined to appoint Mr. Richardson because of the obvious conflict of interest. Nevertheless, Mr. Richardson filed various Adversary Proceedings before and while his petition for appointment was pending. To the knowledge of the Proposing Creditor, none of these Adversary Proceedings has been served on the named defendants. However, answer, counterclaims and third party claims have been filed in one such Adversary Proceeding by Edmundo Uribe, MCC Technologies, and Niaski, Inc.

The evaluation of the potential for recovery by the Estate arising from the Adversary Proceedings is difficult to assess. The Creditors should consult the case files to obtain a more complete understanding of the Adversary Proceedings. The description here is limited to a summary assessment. It is apparent that in order to litigate the Adversary Proceedings substantial costs will be incurred by the Estate.

a.      Debtor v. Thomas L. Kummer, Peter Strojnik and Tanya C. Strojnik, Raymond Cabreja, CSK Partnership, Eduardo Alonzo, Ruben Hinojos ad Marcela Hinojos, and Cynthia Reynoso Case Number 2:07-ap-00342-GBN. There are multiple claims included in the Adversary Complaint against seemingly unrelated defendants. No Summons has been served on the defendants. The allegations can be summarized as follows:

---

[37] Pursuant to the order approving Mr. Dake as counsel to the Trustee, he is entitled to payment of legal fees on an hourly basis. The Adversary Proceedings are expected to require substantial fees and costs to be incurred by the Estate to Mr. Dake.

[38] It is not clear if the secured Post-petition claim of Merchants Bonding would duplicate the Pre-petition claims of Merchants Bonding as reflected in the Reports. Nevertheless, the secured claim of Merchants Bonding pursuant to the Cash Collateral Orders is clearly a Post-petition liability.

24

i.      Avoidance Of Preferential Transfers Pursuant To 11 U.S.C. Section 547(b). The principal claim is that the Debtor paid these individuals amounts legitimately owed but that such payments exceeded amounts that would have been received had the Debtor filed under Chapter 7 of the Bankruptcy Code and liquidated. On its face, this fundamental allegations appears untrue as at the Petition Date the Debtor had assets in excess of then existing liabilities in accordance with the Schedules accompanying the Petition.

ii.     Avoidance Of Fraudulent Transfers and Obligations Pursuant to 11 U.S.C. Section 548. The principal claim is that Cynthia Reynoso, Ruben Hinojos, and Eduardo Alonzo received distributions from the Debtor prior to the Petition Date for which adequate consideration was not given to the Debtor, including stock in Can-Cal Resources, Ltd. These allegations appear to be true, but it is not known whether any of the defendants are able to repay amount distributed by the Debtor to them. The Can-Cal Resources, Ltd. stock was distributed to the named defendants and others for no consideration, and recovery of such stock by the Estate will probably be accomplished.

iii.    Avoidance Of Post-Petition Transfers Pursuant To 11 U.S.C. Section 549. These allegations are directed against Kummer, Strojnik and Cabreja. In effect, the claim is that these persons received Post-Petition distributions without Court approval. In the case of Strojnik, that does not appear to be true as Strojnik was properly appointed as an attorney for the Debtor-In-Possession by order of the Court. Kummer acted as Chief Financial Officer of the Debtor from the Petition Date to January, 2006. Cabreja acted as Chief Executive Officer and thereafter as a sales representative of the Debtor from the Petition Date until January, 2006. The claims of Kummer for unpaid compensation for the period were approved by the Court. It is questionable whether the claims set forth are sustainable. The Summons has not been served on these defendants, and it is not clear what counterclaims will be filed if and when service is made.

iv.    Recovery Of Avoided Transfers Pursuant to 11 U.S.C. Section 550. The allegations are that all transfers described theretofore in the Adversary Complaint are subject to being returned to the Estate.

v.     Disallowance Claims Pursuant To 11 U.S.C. Section 502(d). Based on the foregoing allegations, the claims, some of which have previously been approved by the Court, are sought to be disallowed.

vi.    <u>Conversion.</u> The allegations are that Cynthia Reynoso converted $98,385.40 from the Debtor Pre-petition. These allegations may be meritorious, but it is doubtful that Cynthia Reynoso will be able to repay the Debtor based on what is believed to be her financial position.

25

vii.   **Conspiracy, Conversion, Breach Of Fiduciary Duty.** These allegations are directed against Alonzo, the former Chief Financial Officer of the Debtor, for his actions Pre-petition. The allegations relate to an alleged conspiracy between Alonzo and Cynthia Reynoso concerning the previously alleged conversion.

viii.   **Malpractice.** These allegations relate to purported accounting malpractice of Alonzo.

Creditors are encouraged to review the Adversary Complaint available from the Court to assess the potential for recovery by the Estate. The foregoing is a summary only. It is also important to note that the Proposing Creditor is a defendant in this matter.

b.   **Debtor v. Edmundo Uribe and Denise Uribe, and MCC Technologies, Inc. Case Number 2:07-ap-00341-GBN.** The allegations contained in the Adversary Complaint seek recovery of all amounts paid to Edmundo Uribe and MCC Technologies, Inc. beginning in 2000, including salary and wages paid since July, 2006. Uribe and MCC Technologies, Inc. have filed counterclaims seeking recovery from the Estate and have notified the Adversary Plaintiff that they intend to seek sanctions for improper filing of the Adversary Complaint.

The Adversary Complaint brings into issue the complex relationship between the Debtor, Alejandro Reynoso, and Edmundo Uribe and MCC Technologies, Inc. which cannot be fully described here. It is clear that Uribe and MCC Technologies, Inc. were paid sums over a long period of time by the Debtor for various services rendered to the Debtor. Various technology was licensed by Niaski, Inc., which is now a counterclaimant, and that technology and the expertise of MCC Technologies, Inc. served as the basis for the Debtor's environmental business and operations of the Tierra Division. It is also clear that Uribe served as an employee of the Debtor-In-Possession and the reason for the claim that payment of salaries and wages Post-petition is recoverable by the Estate is not clear.

A particularly disturbing element of the case is the claim by Uribe that the Adversary Proceeding was brought by Mr. Richardson, the attorney for Alejandro and Cynthia Reynoso, before his application for appointment as counsel for the Estate was filed or considered by the Court, for the purpose of keeping Uribe from providing information about possible insurance fraud by Alejandro Reynoso, serving as the principal of the Debtor-In-Possession, to CNA Insurance. Ultimately, Mr. Richardson's efforts to be appointed as counsel to the Estate were unsuccessful because of the clear conflict of interest as the lawyer of Alejandro and Cynthia Reynoso, who paid him to file the Adversary Proceedings.

26

The outcome of the litigation is difficult to assess at this early stage. Some recovery may be possible against the defendants, but it is clear the Debtor received substantial benefit from the efforts of Uribe and MCC Technologies, Inc. The failure of the Estate to credit Uribe and MCC Technologies, Inc. with payments made to the Debtor on various loans to Uribe, the fact that many of the payments to Uribe resulted in the issuance of stock by Golden Anvil, Inc. which were issued in the name of Alejandro Reynoso, and the apparent overreaching of the Adversary Complaint give some credence to the counterclaims suggesting that the Adversary Complaint was brought for purposes other than a legitimate attempt to recovery assets for the Estate.

Creditors are advised to review the various pleadings in the matter to assess the potential for recovery by the Estate.

c.     <u>Debtor v. Alejandro Reynoso, Cynthia Reynoso, Chris Reynoso, Michael Reynoso, Stefanie Reynoso, Felice Leyva, and Jose Louis Bernal Case Number 2:07-ap-00342-GBN.</u>  This Adversary Proceeding seeks recovery of amounts paid by the Debtor to Alejandro Reynoso pursuant to Bankruptcy Code Sections 547(b) and 548 of approximately $13,000; return to the Estate pursuant to Bankruptcy Code Sections 544 and 550 and A.R.S. Section 44-1004(A) of shares of Can-Cal Resources, Ltd. purchased by the Debtor but issued to the various defendants associated with Alejandro and Cynthia Reynoso including their children; and recovery by the Estate pursuant to Bankruptcy Code Sections 544, 548 and 550 and A.R.S. Section 44-1004(A) of 111,250 shares of Series A and 4,258,917 shares of Series B stock of Golden Anvil, Inc. purchased by the Debtor but issued to Alejandro Reynoso. Alternatively, even though the total expended by the Debtor exceeded $800,000 for the Can-Cal Resources, Inc. stock and the Golden Anvil, Inc. stock, the Adversary Complaint suggests that Alejandro and Cynthia Reynoso may simply pay the $242,000 promissory note above described and retain the stock.

Alejandro Reynoso has admitted in open court that he holds bare legal title to the Golden Anvil stock for the benefit of the Debtor. Nevertheless, the Adversary Complaint seeks to treat such stock as owned by Alejandro Reynoso and does not allege he holds the stock as an asset of the Debtor as a fiduciary thereof. Alejandro Reynoso has further admitted in open court that he owes the $242,000 promissory note in addition to holding the Golden Anvil stock for the Debtor.[39]

---

[39]   The Adversary Complaint does not raise Section 542 of the Bankruptcy Code which specifically requires Mr. Reynoso to turn over the stock purchased by the Debtor but issued in Mr. Reynoso's name at Mr. Reynoso's direction to the Estate and pay the promissory note at the time of the filing of the Bankruptcy Petition, which Mr. Reynoso signed. Obviously, Mr. Reynoso, as a director of Golden Anvil, Inc., directed that the Golden Anvil stock be issued in his name and his failure, after the filing of the Bankruptcy Petition, to deliver the stock to the Estate is a matter of concern to the Creditors, but the Adversary Complaint raises none of these issues.

27

The Adversary Proceeding was filed by an attorney who was paid by Alejandro Reynoso and Cynthia Reynoso before his appointment was considered by the Court, and the Adversary Complaint was structured to benefit the Reynoso's to the detriment of the Bankruptcy Estate. The Trustee has not amended the Adversary Complaint to protect the Bankruptcy Estate to date, and there is no indication that the Trustee intends to do so. It does not appear that the Summons and Adversary Complaint have been served on the defendants. Additionally, in a recent divorce proceeding, Alejandro and Cynthia Reynoso sought division of the Golden Anvil stock as part of their marital estate in apparent disregard of the fact that the stock is part of the Bankruptcy Estate.

The Creditors and Interest Holders are encouraged to review the Adversary Complaint. It is not clear whether the Adversary Proceeding will be effectively pursued by the Trustee, what the value of the Golden Anvil stock may be, or whether the Reynoso's have any assets to satisfy the $242,000 promissory note.

## 6.  ALTERNATIVES TO CONFIRMATION AND CONSMMATION OF THE PLAN.

### a.  Alternative Plans of Reorganization.

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtor or another party in interest could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plans might involve both a reorganization and continuation of the Debtor's businesses or an orderly liquidation of assets. It does not appear that the Debtor will propose such a plan of reorganization as no such plan has been proposed in over two years since the filing of the Bankruptcy Petition and the viability of ongoing profitable operations is extremely small.

With respect to an alternative plan, the Proposing Creditor has explored various alternatives in connection with the formulation and development of the Plan. The Proposing Creditor believes that the Plan enables Creditors and Interest Holders to realize the greatest possible value under the circumstances and, compared to any alternative plan of reorganization, has the greatest chance to be confirmed and consummated.

### b.  Liquidation Analysis.

When evaluating the terms of the Plan, each creditor and interest holder belonging to an Impaired Class should compare their treatment under the Plan with how they would be treated if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

28

A liquidation analysis of the Debtor was prepared as of July 31, 2007. The detailed liquidation analysis is attached as Exhibit D to this Disclosure Statement. The Proposing Creditor used its best efforts to arrive at the liquidation values, which are reflected in Exhibit D. As set forth below and in Exhibit D, the Debtor's liquidation analysis shows the following: a) the shareholders are not an impaired class because they would receive nothing in liquidation under any scenario; b) the liquidation of the Debtor would leave nothing for the Pre-petition Creditors; c) the Post-petition secured and priority Creditors will receive payment in full in liquidation and Post-petition unsecured Creditors will receive only partial payment in liquidation.

      i.     <u>Assumptions.</u>

In developing the liquidation alternative, several assumptions have been made with respect to the liquidation value of the Debtor's Assets:

      a.     <u>Cash.</u> It is assumed that the cash of the Debtor will be available for distribution to the Creditors in liquidation.

      b.     <u>Accounts Receivable.</u> It is assumed that Accounts Receivable of the Debtor will be collected to the extent of 80% of their face value after allowing for costs associated with collection.

      c.     <u>Notes Receivable.</u> It is assumed that the Notes Receivable will be of no value in liquidation because they are owed principally if not entirely by Alejandro Reynoso who is believed to be judgment proof.[40]

      d.     <u>Prepaid Expenses.</u> It is assumed that Prepaid Expenses represent refundable amounts from insurance companies, utilities, and others which can be collected in liquidation in the form of refunds.

      e.     <u>Net Property, Plant And Equipment.</u> It is assumed that Property, Plant and Equipment can be sold in liquidation at its net book value, except for leasehold improvements which will remain the property of the landlord upon termination of the lease on the Debtor's premises. The net book value of the leasehold improvements is estimated at $250,000.[41]

---

[40] The financial position of Alejandro and Cynthia Reynoso is not entirely known. It is believed their principal asset, their home, has little or no equity because of the lien placed thereon by Merchants Bonding. The Reynosos are not believed to have other appreciable assets available from which a judgment against them on the promissory note would be collectible.

[41] The estimate of the amount of Net Property, Plant and Equipment reported by the Debtor attributable to leasehold improvements is based on an analysis of insurance claims and interviews with the project manager who was in charge of reconstruction of the premises after the October 3, 2006 flood as well as the notes to the Report for June, 2007.

29

f.   Other Assets.  The Proposing Creditor cannot identify the Other Assets, and therefore it is assumed they can be liquidated for their reported book value.

g.   Adversary Proceedings.  No value has been assigned to the Adversary Proceedings described above. With the exception of those against Alejandro and Cynthia Reynoso, it is considered unlikely by the Proposing Creditor that the litigation will ultimately succeed in collection of amounts necessary to pay the costs incurred by the Estate in pursuing the litigation. With respect to Alejandro and Cynthia Reynoso, the Estate should recover the Can-Cal Resources, Ltd. stock and the stock of Golden Anvil, Inc. which belong to the Estate and to which the holders thereof have but bare legal title. Nevertheless, the value of these shares is not readily determinable and it is not clear the costs associated with recovery will exceed the liquidation value of the shares.[42]

In developing the liquidation alternative, several assumptions have been made with respect to the payment of Post-petition Creditors' claims:[43]

a.   Secured Creditors.  Merchants Bonding Company, pursuant to a series of Cash Collateral orders, has a secured claim against the assets of the Debtor of approximately $160,000.[44]

---

[42]  Can-Cal Resources, Inc. is a publicly traded company with its stock listed on the lowest level of NASDAQ. Its value fluctuates dramatically. There is some value available from liquidation of the Can-Cal Resources, Inc. stock, but it is not clear such value will be equal to the cost of recovering the stock from the Reynoso family and others. With respect to Golden Anvil, Inc., the stock is not publicly traded. Golden Anvil, Inc. is a Mexican mining company which owns a mine known as the Colomo Mine in the Sierra Madre. The mine has never produced appreciable precious metals and has never been profitable. The mine may now be going into more consistent production, but it is not clear that the Golden Anvil, Inc. stock has any appreciable value and it is not clear whether the cost of recovering the stock from Alejandro Reynoso can be recouped by the Estate from sale or ownership of the Golden Anvil, Inc. stock. Stock of Golden Anvil, Inc. is subject to a shareholders agreement which requires the stock to be offered first to the other shareholders of the company. Litigation with respect to application of the shareholders agreement, the value for which such shares must be offered if the stock is transferred from Alejandro Reynoso to the Estate, and the effect of any transfer to a third party by the Estate must be litigated in Mexico. A fair reading of the shareholders agreement is that the stock will be subject to offer to the other shareholders both upon transfer by Alejandro Reynoso to the Trustee, and again if the Trustee attempts to sell the stock.
[43]  There are only a few Post-petition claims which have been approved by the Court, including the claims of the Proposing Creditor, the secured claim of Merchants Bonding, and the initial claims of Lewis and Roca. It is assumed that all Post-petition claims which have not been approved by the Court will be treated as administrative claims once they are submitted and approved by the Court.
[44]  The most recent Cash Collateral Order requires the payment to Merchants Bonding Company by the Estate with respect to the secured claim of $50,000. Such payment is not assumed in this liquidation analysis, but whether paid from existing cash or sale of Estate assets the net effect is the same.

Case 2:05-bk-10489-GBN   Doc 419   Filed 08/30/07   Entered 08/30/07 12:30:42   Desc
Main Document   Page 30 of 40

b.  Taxes Payable.  The reported Taxes Payable are believed to consist of claims of the Internal Revenue Service for payroll taxes relating to the third quarter of 2005.  These are considered priority administrative claims.[45]

c.  Accounts Payable.  Attached to the July 31, 2007 Report is a listing of trade accounts payable.  The reported Post-petition trade accounts payable total $380,505.90.  Included in the reported Accounts Payable is $274,482.34 owed to Lewis and Roca.  There is no amount shown for the Arizona Department of Revenue.  It is assumed that the actual trade Accounts Payable, not including professional fees, is $106,023 as reported on the July, 2007 report and that there are no other accounts payable owed by the Debtor.

d.  Leasehold.  The Debtor in February, 2007 executed a new five-year lease on the premises occupied by the Debtor.  The obligations pursuant to the lease are obligations of the Estate that will become administrative claims if the lease is breached by the Estate when liquidation occurs and operations are terminated.  The amount of such claim is difficult to estimate because damages may be mitigated through re-lease of the premises upon breach by the Debtor.  However, there are a number of vacancies within the same business park in which the premises are located.  The rent is approximately $10,000 per month.  It is estimated that the claims of the landlord will amount to twelve months rent on the premises.

e.  Notes Payable.  It is assumed that the Notes Payable are due to insiders and will not be paid.  It is obvious that Alejandro Reynoso owes the Debtor far more than he could claim based on Post-petition notes which may have been signed in his favor by the Debtor-In-Possession.

f.  Professional Fees.  It is assumed that the previously approved fees and costs of Lewis and Roca plus the recently filed claim for additional fees and costs will be finally approved by the Court, and that the Trustee and its counsel will receive approval for $25,000 of fees and costs[46].

g.  Accrued Liabilities.  The identify of the Accrued Liabilities is not known to the Proposing Creditor.  It is assumed that they are as reported.

---

[45] The Arizona Department Of Revenue is not reflected as a creditor in the Reports, although substantial claims for unpaid taxes have been filed arising from the Yuma Projects.  Some of these claims related to Pre-petition amounts owed, but since the Yuma Projects continued Post-petition it seems likely that there will be additional claims for unpaid taxes by the State of Arizona. It is unclear how much of these Post-petition claims will be, but they are disregarded in this liquidation analysis.

[46] The Trustee and his counsel have not yet submitted any requests for approval of fees and costs.  Therefore, the amount used in this liquidation analysis is purely an estimate.

31

h.    <u>Unlisted And Undetermined Claims.</u> Potential claims, which may arise from the investigation by CNA Insurance of potential insurance fraud by Alejandro Reynoso, may affect the Estate and claims by the Arizona Department of Revenue for taxes owed relating to the Yuma Project Post-petition may substantially alter the liquidation analysis. The effects of these potential claims are disregarded in the liquidation analysis, however, because they cannot at this time be quantified.

In developing the liquidation analysis, the following assumptions are made with respect to the Pre-petition liabilities:

a.    The Pre-petition unsecured claims have been increased in the Reports since the Petition Date. This increase is believed to have arisen from losses relating to the Yuma Projects and are owed to Merchants Bonding. Thus, at the Petition Date unsecured debt was listed totaling $902,996.99. As of July 31, 2007 the unsecured Pre-petition dated was reported to be $1,421,724.30.

b.    The secured Pre-petition claims and priority claims as of the Petition Date are reflected on the Reports as fully paid and are assumed to be so.

ii.    <u>Summary of Liquidation Analysis.</u>

If the Debtor is liquidated, there will be no funds available for any Creditor or Interest Holder except administrative claimants[47]. The Post-petition secured and priority claims will be paid in full. The remaining administrative claimants will receive approximately 94% of their claims. There will be no funds for payment of the Pre-petition Creditors or the other Interest Holders. If the Debtor were to be liquidated, as reflected in Exhibit D, based on the above-described assumptions the sale of all assets of the Debtor would result in $862,238 in cash in the Estate. From that amount, the secured claims of Merchants Bonding assumed to be $160,000 would be paid first. Second, the priority claims of the United States for Post-petition taxes reported to be $48,383 would be paid. The remainder would be apportioned among the remaining administrative claimants leaving nothing for the Pre-petition Creditors or shareholders.

c.    <u>Potential For Operating Reorganization Plan</u> Continuing the operations of the Debtor will likely result in the accrual of additional administrative claims now that the operations are not being subsidized by insurance proceeds. As

---

[47]  Administrative claims are defined in Bankruptcy Code Section 503(b). Administrative claims are given priority over other claims in accordance with Bankruptcy Code Section 507(a). Thus, any claims which are not secured claims or Post-petition priority claims will receive nothing in a liquidating distribution until the administrative claims have been paid in full.

32

described above, it is highly unlikely that the Debtor can reach an operating break even point much less provide for repayment of existing claims. Attached as Exhibit F is a Break Even Analysis. The principal assumptions relating to the Break Even Analysis are as follows:

  i.     Revenue Assumptions.

          a.     It is assumed that Gross Sales will continue to average $147,918.87 monthly as during the period July 1, 2006 through July 31, 2007.the same as they did during the period July 1, 2006 through June 30, 2007.[48]

          b.     The Debtor has limited working capital. The Debtor produces Gross Sales by in effect selling time of its personnel. There is approximately a thirty-day period between the time of billing and the time of collection, and it requires approximately 60 days on average from the time of receipt of work from the Debtor's customers before the work can be completed and billed. Thus, to increase sales the Debtor would require working capital for approximately 90 days. It is assumed that no working capital is available to the Debtor to increase its Sales.

  ii.    Cost Of Operations Assumptions.

          a.     The Cost of Sales is principally related to the cost of salaries and benefits required to perform the work necessary to generate Sales. Over the period July 1, 2006 through July 31, 2007 Cost of Sales has averaged 59% of Gross Sales, and it is assumed this percentage will continue. The Cost of Sales is variable cost but cannot easily be reduced below the average percentage reflected in the Reports.

          b.     Operating Costs have averaged $105,098 per month during the period July 1, 2006 through July 31, 2007. The Operating Costs reported for May, June and July, 2007 were $74,544, $76,660 and $72,675, respectively. It is assumed that Operating Costs will continue at a level of $75,000 per month, and there does not appear to be a reasonable opportunity to reduce the Operating Costs appreciably.

---

[48]  Revenues during this thirteen month period generally reflect earnings from operations of the EDM Division of the Debtor, the only remaining business operations of the Debtor. Gross Sales vary from month to month based on the amount of Work-In-Process completed and billed during the month. Gross Sales for the EDM Division have averaged approximately $150,000 per month since 2002, but the number of personnel now available to the Debtor is at its lowest point since 2002 and cannot produce as much Gross Sales as in the past.

33

iii.     Summary Of Break Even Point Analysis.

Assuming the average Gross Sales of $147,918, a 59% Cost of Sales, and Operating Costs of $75,000 per month, continued operations of the Debtor will result in a monthly loss of $14,899 which will have to be funded from further borrowing from suppliers and other future administrative claimants.

To break even, Gross Sales on these assumptions would require consistent monthly Sales of $184,500. To provide a $25,000 monthly payment to the Creditors would require approximately $246,500 average Sales per month. Thus, to break even the Debtor must increase its Gross Sales by approximately 25% over the Sales achieved over the previous 13 month period, and to make payments to the Creditors of $25,000 per month the Debtor must increase its Gross Sales by almost 67% of the average Sales achieved over the preceding 13 months.

With no working capital with which to increase its capabilities, even obtaining a large contract is not sufficient to provide for break even operations, much less payment of the Creditors. It is unrealistic to assume that substantial increases in Sales can be achieved by the Debtor.[49]

## 7.     GOING CONCERN VALUATION.

The Debtor has no value as a going concern. Its value as a going concern is limited to its ability to pay the Creditors and Interest Holders through continuing operations under a plan of reorganization. However, no plan to do so is possible, and in over two years in Chapter 11 the Debtor has proposed no plan for reorganization which will allow continued operations of the Debtor.

The Debtor over the period July 1, 2006 through July 31, 2007 has produced operating losses in excess of $584,972 and negative operating cash flow totaling $484,752. There is no prospect for the Debtor to produce sufficient Sales to break even, much less reduce the debts of the Bankruptcy Estate through future operations.

## 8.     REORGANIZED DEBTOR.

The Proposing Creditor believes that, among other benefits, Confirmation of the Plan will preclude the accrual of additional administrative claims due to continuing operating losses of the Bankruptcy Estate. Additionally, Confirmation

---

[49]  Sales and Cost Of Sales vary from month to month, sometimes greatly. In some months, a substantial portion of the billings represent work performed in prior months. In subsequent months usually the billings decline as the time necessary to complete and bill projects is required. Therefore, the only meaningful method of analysis is to use averages over a reasonably representative period of time.

34

of the plan will avoid default on the lease which the Debtor executed in February, 2007. Default on the lease will likely give rise to a substantial administrative claim by the landlord. Furthermore, Confirmation of the Plan will eliminate the necessity of the Bankruptcy Estate funding expensive litigation with respect to the Adversary Proceedings.

The Plan has, as its foundation, the sale of the Debtor's assets, including all claims in the pending Adversary Proceedings and which may otherwise be determined by the Purchaser, to a newly formed company. The cash of Debtor will be used to pay the secured and priority claims upon consummation of the sale by the Purchaser. The Purchaser will assume the lease of the Debtor's premises and will pay all remaining administrative claims up to a value of $1,000,000. Under the Plan, Creditors and interest holders of the Debtor will receive value as follows, which should be compared with the liquidation analysis asset values described above:

| | | |
|---|---|---:|
| Payments To Trustee | $ | 97,532 |
| Payment Of Secured Debt | $ | 160,000 |
| Payment Of Priority Debt (Taxes) | $ | 48,383 |
| Assumption Of Accounts Payable | $ | 106,023 |
| Assumption Of Lease | $ | 120,000 |
| Assumption Of Professional Fees | $ | 420,984 |
| Assumption Of Accrued Liabilities | $ | 47,078 |
| Total | $ | 1,000,000 |

Furthermore, the Purchaser will assume contingent liabilities for counterclaims exerted against the Estate in the Adversary Proceedings as well as fund all litigation relating to the Adversary Proceedings.

This total value should be considered in light of the liquidation analysis above and compared to the estimated liquidation value of the assets of the Bankruptcy of Estate which now has a liquidation value estimated to be $862,238.

The Purchaser proposes to assume the existing lease. The Purchaser proposes to pay the secured claims and the priority claims, consisting of the secured claims of Merchants Bonding and the Internal Revenue Service, and thereafter pay administrative Creditors and the Trustee up to $791,616 over a period of sixty (60) months without interest with equal monthly installments beginning the month after the purchase. The Purchaser will retain the right to settle any administrative claims for less than approved by the Court or alternatively pay such administrative claims early for a discount or other consideration. The Purchaser will be credited, in any event, with the amount of the claims approved by the Court.

35

The Purchaser will grant to the administrative claimants and the Trustee as a group a security interest in the assets of the Purchaser, and make certain warranties and representations which will allow the Creditors of the Estate whose claims have been assumed to liquidate the assets of the Purchaser if the Purchaser fails to make payments or otherwise fails to meet certain specified financial criteria.

The Purchaser will negotiate with CNA Insurance with respect to the potential claims of fraud on the part of the Estate. To the extent that such claims are successfully asserted, the payments will be made from amounts that would otherwise be paid to the Trustee.

The Creditors will, therefore, have received the maximum amount possible from the Bankruptcy Estate. The only class of Creditors impaired by the Plan are the unsecured administrative Creditors without a priority position. The secured and priority Post-petition Creditors will be paid in full at closing of the sale of the Debtor's assets. The Pre-Petition Creditors and other Interest Holders are not impaired because they would receive nothing in liquidation.[50]

a.    The Purchaser's Business Plan.

i.    In General.

The Business Plan of the Purchaser includes continuation of the business of the Debtor. The expansion of the business is also anticipated. The Purchaser will utilize the cash flow generated from the accounts receivable purchased from the Estate and invested capital for working capital to expand the business. Since the assets of the Purchaser will be encumbered to secure payment to the Creditors, all capital for expansion of the business will be equity capital.

The Purchaser intends to take a variety of steps to reduce Costs Of Operation, including performing some of the services for customers off shore to bring down Cost of Sales as a percentage of Sales. The Purchaser will also bring back several key personnel who have left the Debtor's employ since filing of the Petition In Bankruptcy because of the mismanagement of Alejandro Reynoso. The Purchaser will also bring several new lines of business and new customers to the business.

ii.    Business Plan Assumptions.

It is assumed that existing contracts with customers of the Debtor will continue unimpaired, and that Alejandro Reynoso will not seek to undermine the efforts of the Purchaser to continue the existing business and expand existing customer relationships. It is further assumed that the Purchaser will be

---

[50] Bankruptcy Code Section 1124.

36

successful in expanding the business to include relationships with telecommunications companies, environmental engineering customers, and other areas. It is further assumed that Operating Costs can be reduced by eliminating payments to Alejandro Reynoso and members of his family that do not benefit operations. It is assumed that the Purchaser will be successful at assuming or renegotiating the lease on the premises now occupied by the Debtor and that the Purchaser will be able to utilize portions of the space not required for operations for other purposes to reduce rent costs to the Purchaser.

There is no assurance that the above-stated assumptions will in fact materialize. However, the Creditors will hold a first security interest in all assets of the Purchaser so long as they have not been paid in accordance with the Plan. Thus, if the assumptions fail to become reality or for other reasons the Purchaser is not able to meet its obligations under the Plan, the Creditors will have assets to liquidate of value similar to those of the Estate in liquidation as of July 31, 2007.

    iii.    <u>Funding of the Plan.</u>

No new funding is anticipated for the Debtor.

    iv.    <u>Management of Purchaser.</u>

The management of the Purchaser will include former key employees of the Debtor. The Proposing Creditor will serve as the Chief Operating Officer. The former Controller of the Debtor will serve as the Controller of the Purchaser.

b.    <u>Risks and Opportunities Under Business Plan.</u>

The most important risk is that the Purchaser will not be able to expand the business sufficiently to make the payments to the Creditors under the Plan. The Purchaser will have limited capital, and such capital may not be sufficient to carry operations and make payments under the Plan for the period necessary to expand the business. Additionally, the Purchaser may suffer diminution of its assets which could reduce the liquidation value of its assets if there is a default. However, the Purchaser will agree to immediately liquidate if the total assets of the Purchaser are reduced below the value of the obligations to the Creditors under the Plan.

**9.    SUMMARY OF PLAN OF REORGANIZATION.**

a.    <u>Introduction.</u>

This Disclosure Statement contains a summary of the Plan, and is qualified in its entirety by the full text of the Plan itself. All terms defined in the

37

Plan have the same meaning in this Disclosure Statement. The Plan, if confirmed, will bind the Debtor, any entity acquiring property under the Plan or otherwise transferring property pursuant to the Plan, and all Creditors and Interest Holders in the Debtor's Case. The Plan is intended to deal with all Claims against he Debtor and the Estate and all Interests in the Debtor of whatever character, whether or not contingent or liquidated, and whether or not allowed by the Bankruptcy Court pursuant to Bankruptcy Code section 502 (11 U.S.C. Section 502). All Creditors, Interest Holders, and other interested parties, are urged to carefully read the Plan.

The Plan designates three Classes of Claims and Interests. A Claim or Interest shall be deemed classified in a different Class to the extent that any remainder of the Claim or Interest qualifies within the description of such different Class. A Claim is in a particular Class only to the extent that the Claim is an Allowed Claim or an Allowed Secured Claim in that Class.

b.      The Plan.

The following summarizes the significant provisions contained in the Plan:

i.      The Secured Creditors and Priority Administrative Creditors will be paid in full upon confirmation of the Plan.

ii.      The Unsecured Administrative Creditors as defined in Bankruptcy Code Section 503 will receive promissory notes from the Purchaser secured by all assets of the Purchaser. The promissory notes will require payments of their claims in full over sixty (60) equal installments. The promissory notes will be secured by a Collateral Agreement which will secure each of the promissory notes ratably and the security interest granted thereunder will be properly recorded.

iii.      The Trustee will receive upon approval of the Plan the sum of twenty-five thousand dollars ($25,000) with the remaining balance payable in sixty (60) equal installments. The balance due to the Trustee will be determined by subtracting from the one million dollar ($1,000,000) purchase price all amounts paid to the Secured Creditors and Priority Administrative Creditors and the amount of the total promissory notes issued to the Unsecured Administrative Creditors.

iv.      The promissory notes payable to the Unsecured Administrative Creditors and the Trustee will bear interest from the effective date of the plan calculated at six percent (6%) per annum and there will be no pre-payment penalty.

38

## 10. APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS.

The only security being issued pursuant to the Plan are the promissory notes to the Unsecured Administrative Creditors and the Trustee. There are no applicable Federal or State Securities Laws.

## 11. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.

It is not anticipated that there will be any adverse State or Federal tax consequences from adoption of the Plan.

## 12. EFFECT OF CONFIRMATION.

The provisions of the Debtor's Plan of Reorganization, if confirmed, shall bind the Debtor, all Creditors, Interest Holders, and any entity acquiring property under the Plan, whether or not the Claim or interest o such Creditor, Interest Holder, or entity is impaired under the Plan and whether or not such Creditor, Interest Holder, or entity has accepted the Plan.

Dated:

Proposing Creditor

_____

Thomas L. Kummer

Attachments:

Exhibit A  &ndash;  Operating Results Of Debtor Since Petition Date

Exhibit B  &ndash;  Debtor's Income Statements July 1, 2006 Through July 31, 2007

Exhibit C  -  Comparative Balance Sheet Of Debtor Since Petition Date

Exhibit D  -  Liquidation Analysis

Exhibit E  &ndash;  Work In Process February 22, 2007 To August 13, 2007 From Tracker System

Exhibit F  &ndash;  Break Even Analysis

39

Exhibit G  -  EDM Division Sales 2003, 2004, 2005, 2007

Exhibit H  —  Resume Of President and Chief Operating Officer Of
            Purchaser